403 So.2d 275 (1980)
Richard GRAHAM
v.
STATE.
4 Div. 787.
Court of Criminal Appeals of Alabama.
April 1, 1980.
Rehearing Denied April 22, 1980.
*276 Myron H. Thompson, of Thompson & Faulk, Dothan, for appellant.
Charles A. Graddick, Atty. Gen., J. T. Simonetti, Jr., Asst. Atty. Gen., for appellee.
BOOKOUT, Judge.
During the late evening hours of June 29, 1977, Mary Ann James was raped and stabbed to death in her apartment in Daleville, Alabama. She had been stabbed at least fifty-seven times. At the time of the crime, the victim was a lieutenant in the Missouri National Guard on active duty at Ft. Rucker, Alabama. The appellant was a warrant officer and likewise stationed there.
The appellant was indicted for the capital offense of "rape when the victim is intentionally killed by the defendant," § 13-11-2(a)(3), Code of Ala.1975. He first entered a plea of not guilty, but later changed his plea to guilty after his trial counsel engaged in plea bargaining on his behalf. After an extensive colloquy, in camera, pursuant to Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and execution of an Ireland form (Ireland v. State, 47 Ala.App. 65, 250 So.2d 602 (1971)), the appellant's change of plea was accepted by *277 the trial judge. A jury was empaneled for the purpose of allowing the State to present a prima facie case pursuant to § 15-15-24(a), Code of Ala.1975, and the procedure approved in Prothro v. State, Ala.Cr.App., 370 So.2d 740 (1979). The State then introduced evidence which we will summarize below.
Major Anthony Keil was the "Field Officer of the day" at Ft. Rucker on the date of the crime. He saw the appellant talking to the victim at the Officers Club around 10:15 or 10:30 that night. Keil talked to both the victim and the appellant, and when he left the club after about twenty minutes, Graham and Lieutenant James were still talking and drinking together.
Iris Croshaw was the night clerk at the Daleville Inn where the victim resided. On the night of the crime, the appellant came to her office sometime between 10:15 p. m. and midnight and asked for the apartment number of a Mr. Bailey. However, when the appellant received that information, he said that since it was so late he would leave and return the next morning to see Bailey. A map of the apartment complex showing the location of each apartment was displayed on the desk of the office in the presence of the appellant. Lieutenant James' body was found in her apartment the next day.
Robert Nipper was the appellant's cellmate in the Dale County jail where the appellant was awaiting trial on the instant charge. The appellant admitted the murder to Nipper and made elaborate plans for Nipper to escape and kill another woman in the same manner. Appellant believed that another identical crime committed while he was in jail would convince the police he was innocent and he would be released from jail. From the record:
"Q. Would you tell the jury what all he [appellant] told you about the James girl?
"A. Well, he told me that he had met her in a bar that night and talked to her, and he went back to drinking and didn't talk to her no more until later on. He said he was going up to these Daleville Apartments to check on a friend of his coming in from another country, and he had seen her in the parking lot, so he went up there and tried to talk to her again and was trying to pick her up. He said they got to arguing and that's all he said about it at that time. He cut me off.
"Q. Now, did you on occasion more than once talk to him in regards to that particular case?
"A. Yes, sir.
"Q. Did he tell you other things about what he wanted you to do?
"A. Yes, sir, we had talked about it for a long time. We made an agreement that I was to escape and go out there and kill another woman just like he did so he could get out. He had wrote down on this paper what he wanted me to do to make it look like the same killer. I don't have the paper with me now.
"Q. Will you describe what it says?
"A. Well, he told me to stab her at least 50 times, and he was going to give me some of his hair to take and put on the sheet, and he told me to put her in the bathtub and fill it up with water and turn the mattress over and mess up the room to look like it had been robbed or something."
The appellant gave Nipper the names and addresses of two women he might kill. One worked across the street from appellant at Ft. Rucker, and appellant had obtained the name and address of the other one day when he was at the telephone office and overheard the woman give that information to someone there.
The plans were further detailed by Nipper:
"A. Well, when I got out, I was going to go to North Carolina and stay there and he would give me the name of a trailer park that I could get a job there, and I was to get my social security card and he would give me some school dates and stuff to go get my new social security card with, and I was to
"Q. Speak up. I don't believe they can hear you.

*278 "A. I was to send him that new social security card I got and he was going to make me up a false ID, and I was to come back and kill a woman and then go on back to North Carolina and he was to meet me later up there and inand give me this ID and some money for doing this.
"Q. How much money?
"A. One or two thousand dollars.
"Q. Did you at one time have a microphone hidden about your body?
"A. Yes, sir.
"Q. And this conversation that you're talking about, in addition to what you saidthe other stuff, was that taken down by officers?
"A. Yes, sir.
. . . .
"A. ... That's all thatwhen this murder happened, he was supposed to get out. He was going to meet me at the Holiday Inn Saturday evening at 6:00 on December the 23rd and he was going to give me one or two thousand dollars and driver's license and ID, Honorable Discharge, and certificate for a high school G.E.D., and if he didn't show up there at the time, there is a statue there at Ft. Bragg, and right where this `X' is marked there would be a key down there buried about two inches under the ground and there would be a briefcase in the airport and that key would unlock it there.
"This right here is the name that I was supposed to use; S. A. Grant. I was supposed to say I lived at 71 Marlborough Street, Boston, Mass., and to say I was born on July 28th 1954.
"This says `Fairlane Acres, Mobile Home City' and is where I was supposed to live, and get my social security number "
The note which the appellant gave Nipper with coded instructions was deciphered and read to the jury by Nipper and was admitted into evidence. However, a transcript of one of their conversations tape recorded from a microphone hidden on Nipper was not admitted at trial. Nipper voluntarily told the police about the appellant's incriminating statements to him and volunteered to use a microphone concealed on his body to transcribe other conversations with the appellant. The transcript of a later conversation with the appellant which corroborated the testimony of Nipper was admitted at sentencing.
Dale Carter, a criminalist and laboratory director with the State Department of Toxicology and Criminal Investigation, testified as to the scene of the murder and cause of death. The details of the death scene and murder corresponded exactly with the instructions the appellant gave Nipper as how to commit another murder. The body of the victim was found in the bathroom wrapped in sheets and submerged in water. The bedroom had been ransacked, and the contents of bureau drawers had been scattered about the floor. The mattress on the victim's bed had been turned over and was lying face down. No fingerprints were found indicating to the witness that the contents of the apartment had been deliberately wiped clean or else the intruder had used gloves. Although on first impression a larceny appeared to have taken place, officers found nothing of value missing from the apartment.
The case was submitted to the jury with the understanding that the appellant had entered a guilty plea. The jury fixed punishment at death upon a finding of guilt as mandated by the Alabama capital felony statute, supra, and the trial judge after a sentencing hearing sentenced appellant to life imprisonment without parole.
A presentence investigation report was submitted to the trial judge by the State on the sentencing hearing. Among other things that report showed that the appellant had been charged in Dale County in 1974 for rape and again in 1978 for a rape-murder. As to the first incident, the report revealed:
"Investigation indicates Graham met a Puerto Rican enlisted woman at a dance at Ft. Rucker. Later that night Graham went to the woman's mobile home residence at Daleville and pulled the window airconditioning unit from a window and *279 entered the mobile home. The female occupant, Army Private First Class ... was forced into a bedroom and informed she was to have sex relations with the defendant. [She] refused and the defendant took an electric iron and with the iron's cord choked [her] until she was unconscious. When [she] awoke, she consented to sex out of fear after Graham slapped her and informed her he would kill her if she did not submit. Later Graham forcibly carried [her] to his mobile home at Daleville, Alabama, and while attempting to force her into the mobile home [she] escaped and called the police.
. . . .
"Graham was tried for Rape in the Dale County Circuit Court at Ozark, Alabama, on 9-23-74, and the only witness available was the victim. The defendant was found guilty of Assault and Battery and fined $100.00. The victim was upset with the verdict, returned to Puerto Rico, divorced her husband, and changed her name."
The report likewise showed that the appellant was charged for the April 11, 1978, rape-murder of Donna M. Wilcynski. From the report:
"The victim was a female soldier stationed at Ft. Rucker, Alabama, and she maintained an apartment at Byrd's Apartments, Ozark, Alabama. Ms. Wilcynski had a three year old daughter that resided with her at Ozark. The child has been placed, by the Dale County Juvenile Court, with the grandparents in Ohio.
"The scene of the present offense is an apartment complex surrounding an open area known as the courtyard. Several witnesses testified they saw Graham near, or at the door of, Ms. Wilcynski's apartment several times during the hours prior to the victim's death. Graham approached another woman and requested a date. The victim's parents reside in Ohio and she had telephone called her parents that date, 4-11-78, and stated she was afraid of some black men that were living nearby and requested she drink with them. Several neighbors stated they heard a long, lingering scream between 11:00-12:00 P.M. on 4-11-78, but no one investigated or called the police.
"At 6:30 P.M. the next day, prompted by a suspicious neighbor, an Ozark policeman went into Ms. Wilcynski's apartment. He found the bedroom torn up and scattered. In the bathroom, the officer found Ms. Wilcynski wrapped in a bedsheet in the bathtub. The three (3) year old child was found, in bed, in her room.
"A state toxicologist examined the body and testified the victim had been stabbed 53 times with 44 slice wounds and 9 stab wounds. The toxicologist conducted a thorough examination of the premises and found several body hairs that were Negroid in Ms. Wilcynski's bed. At the trial, the toxicologist testified Ms. Wilcynski had sexual relations just prior to her death. An analysis of the hairs found was made and compared to hair samples taken by Court Order from Richard Graham's body. The laboratory technician stated that there were several similarities in the two hair samples."
Graham was later convicted of first degree murder in the death of Ms. Wilcynski, but that conviction was reversed in Graham v. State, Ala.Cr.App., 374 So.2d 929 (1979), cert. quashed, Ala., 374 So.2d 942. The presentence report continued:
"Graham was returned to jail following his conviction and placed in the maximum security area. Another prisoner by the name of Robert S. Nipper was also serving a sentence at the Dale County Jail in the maximum security area. The defendant Graham and the inmate Nipper were assigned the same two man cell. Nipper engaged Graham into conversation regarding two murder offenses Graham had been arrested for. Nipper stated that Graham's response was, `I did the first job clean, but the second job was a mess and blood was everywhere.' Nipper further stated that Graham said, `The little girl probably messed that up.'"
*280 As to Graham's statements to Nipper concerning the instant offense, the report stated:
"Nipper states Graham related to him, Nipper, that he, Graham, committed the two murders. Apparently Graham encouraged Nipper to escape with some detailed instructions from Graham to commit two rape-murders locally in the same manner as the two charged to Graham. This would lead the authorities to think they had apprehended the wrong man and release Graham. Nipper was to be paid approximately $1,000.00-$2,000.00.
. . . .
"Nipper issued a written statement that reports Graham stated he followed Lt. Mary Ann James from the club to her apartment and stopped her in the parking lot and encouraged her to have sexual relations with him. The woman refused and Graham assumed she was racially prejudiced. Nipper further related Graham stated he could kill a cop or a prejudiced person as easy as stepping on a roach.
"The victim, Army 1st Lt. Mary Ann James, was normally a resident of Cape Girardeau, Missouri. She was married and the mother of a teenage son. Apparently, she did not know Graham and did not entice or provoke the offense."
During the sentencing hearing, the State also introduced a report of a handwriting expert who examined the handwriting on the diagram and coded note which Nipper testified was given to him by the appellant. His report concluded that, after comparing samples of Graham's handwriting to that on the note in question the appellant, Graham, wrote the note.
Also introduced at the sentencing hearing was a transcript of the taperecorded conversation between Nipper and Graham in the Dale County jail. In that transcript Graham and Nipper discussed, inter alia, finding one or two women for Nipper to kill. Graham told Nipper, "there are a bunch of them that live there. Make sure it's a white girl. Right? Graham again went through the details of the murder so that it would appear similar to the other two. Graham stated that a couple of the women he was considering were living alone because their husbands or boyfriends were in jail with him at that time. From the transcript:
"GRAHAM: I hate to do that to somebody that's in jail (laugh). Somebody in jail with me!
"NIPPER: That's life.
"GRAHAM: That would look kind of funny though if a guy found his wife turned up dead in the same way and her husband is in jail with the guyin the same cell with the guywho is charged withthat just committed the same kind of murder. (Laughed)
"NIPPER: Yea, that would look kind of bad."
From the appellant's guilty plea, from the evidence at trial, and from the evidence presented at the sentencing hearing, there is no doubt as to the appellant's guilt. It is shockingly apparent from the record that the appellant is a sadistic and vicious rapist and murderer. His actions were premeditated, calculated, and executed in cold blood without the least regard for the value and dignity of human life. The evidence revealed a man charged with a vile and repulsive crime who remorselessly planned the most heinous and atrocious murders of one and possibly two other helpless and innocent victims for the sole purpose of diverting suspicion from himself. That he was able to save his own life through plea bargaining will be seen by some as a gross travesty of justice and by others as a monument to the humane regard for life afforded in a democratic society. But for this court, we must take a dispassionate and objective view of the case as presented to us and determine if any legal errors occurred which would mandate a new trial. This court does not determine guilt or innocence for that was determined in the trial court. It is our duty here to determine if the appellant has shown any legal grounds to successfully challenge the procedure he used to escape the death penalty.

*281 I
Appellant raises the issue of the constitutionality of the Alabama capital felony act, especially the inability of the jury to convict on a lesser included offense. On that as well as other grounds, this court has found the act to be constitutional. Prothro v. State, supra; Beck v. State, Ala.Cr.App., 365 So.2d 985, affirmed, Ala., 365 So.2d 1006 (1978); Jacobs v. State, Ala.Cr.App., 361 So.2d 607, affirmed, Ala., 361 So.2d 640 (1978), cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979). See also: Evans v. Birtton, 472 F.Supp. 707 (S.D. Ala. 1979).

II
The appellant contends his guilty plea was invalid as it was coerced by (1) actions of his trial counsel and (2) the trial court's denial of a motion for continuance.

A
Appellant asserts on motion for a new trial that his trial counsel were concerned only with his entering a guilty plea and thereby limited their preparation only to such. The record fails to support such a contention by the appellant's current appellate counsel.
The instant record reveals that trial counsel for the appellant filed the following motions and pleadings in his behalf well in advance of trial:
(1) "MOTION FOR DISCLOSURE," filed November 3, 1978.
(2) "PLEA IN BAR," filed November 6, 1978.
(3) "MOTION TO DISMISS INDICTMENT," filed November 10, 1978.
(4) "MOTION FOR FUNDS AND/OR FACILITIES TO POLL POTENTIAL JURORS OF DALE COUNTY AND FOR OTHER RELIEF," filed November 13, 1978.
On January 16, 1979, the trial court granted the appellant's motion for disclosure and ordered the State to produce all items listed in that motion. It was through that motion that defense counsel discovered the evidence which Robert Nipper was to give at trial and the existence of the transcript and the tape recording which corroborated Nipper's testimony.
A letter sent to the appellant from one of his trial counsel, George Trawick, three days before trial clearly illustrates the factors he considered in recommending that the appellant plead guilty. That letter was introduced into evidence by the appellant during the hearing on his motion for a new trial. It is in pertinent part as follows:
"This is to confirm in writing the opinions and advice I have previously given you on numerous occasions orally.
"It is my considered opinion that you must accept the results of our plea bargaining sessions in this case. That is to say, it is my professional opinion that in the event you refuse to accept life without parole you will receive the death penalty. Even though an appeal would be automatic from the death penalty, there is no way that I can assure you that such an appeal would result in a reversal or reduction of sentence. On the contrary, all things considered, I am of the opinion that as matters now stand the case is one which likely would not be reversed on appeal.
"In coming to this conclusion I have weighed the following factors: you are already convicted of a similar offense; should you elect to take the witness stand, this conviction could be shown to impeach you as a witness; the state can conclusively show that you were in the company of the deceased during the evening prior to her death; the state can conclusively show that you were at the motel where the homicide occurred; other than by your own testimony, we cannot establish an alibi; even if you should elect to not testify, your previous conviction might be allowed in evidence as tending to establish identity due to the peculiar characteristics of each crime.
"There is grave and dangerous probability that the state would be allowed to introduce a tape recording which we have discovered and played for you. The effect *282 of this recording, in my opinion, would be devastating.
"In summary, as I have clearly told you, it is my considered opinion that your choice is whether you will change your plea to guilty and live or whether you will stand trial and almost certainly be condemned to death. Consequently, I am compelled to urge you in the strongest possible language to allow Mr. McCabe and I to save your life.
"I have explained to you that as a condition of this, you must sign a written confession, to be seen by the Trial Judge and then sealed by him to be opened only in the event it becomes material on a subsequent appeal or other post-trial action. In short, that statement would not be made public in the proceedings before the trial court. The Trial Judge insists, as a condition precedent to reducing sentence from death to life without parole that such statement not only admit the charged offense, but that it recite a factual basis for the acceptance of your plea. Particularly, the Judge has stated that it should recite the method of entry into the lodgings of the deceased.
"As much as I dislike instructing you to furnish such a statement, I am obliged to tell you that it is a matter of life and death so that you have no real or practical alternative."
The appellant waived his attorney-client privilege and requested Mr. Trawick to testify concerning his representation of the appellant.
Mr. Trawick is a practicing attorney in Dale County with thirty years experience in the practice of law. During that time he has handled between 750 and 1,000 capital cases. He practiced law in Birmingham before moving to Dale County and has had extensive practice in criminal law.
Mr. Trawick testified that no witnesses were called at trial on behalf of the defendant because it was their understanding with the prosecution that "the State would put on a prima facie case, after which Mr. Graham would enter a plea of guilty and would call no witnesses, he would not take the witness stand, and therefore, no witnesses were subpoenaed in his behalf." He testified that the purpose of the plea bargaining negotiations was to save the life of the appellant.
As to why counsel did not consider filing a motion to suppress the use of the tape recording of the conversation between Nipper and the appellant:
"Because I considered that the motion would probably not be granted, and that the effect of that tape recording ever being played to a jury would be devastating, and I felt that there was a point beyond which I could not push the State and still hope to avoid a trial of the case: in short, to save his life. It was a judgment situation, and that was my judgment about it."
The appellant had suggested only one witness to his counsel, that being a fellow inmate. Mr. Trawick did not try to locate that witness for the following reasons:
"[W]e had no idea where his whereabouts were, because I considered that his possible use would hurt more than it would help. Mr. Graham felt that he might be able to testify, or that he should be able to testify that this inmate had also been importuned by the authorities to get Mr. Gramam (sic) to make some compromising statement as Nipper had been. Well, we knew for a fact that Nipper had cooperated in that endeavor. We knew for a fact that the authorities investigating the case were moving along that line, and there is no difficulty of proof along that line. I could not see where the fellow inmate would add anything to help Mr. Graham, and I could see where if we called that witness and put him on the witness stand that he could turn out to be a very surprising witness. I have a deep distrust of jailbird witnesses, and quite frankly, I did not make any real effort to locate the man."
Mr. Trawick testified that he explored with the appellant very thoroughly any evidence of an alibi, and there simply were no alibi witnesses. There likewise were no witnesses that could be used as character *283 witnesses in view of the appellant's previous conviction on the first degree murder charge arising from the death of Donna Wilcynski. Trial counsel had discussed with the appellant the possible use of character witnesses, some of whom had testified in his previous trial, but the appellant "did not think well of calling them again."
It is apparent from reviewing the testimony of the appellant's trial counsel given during the course of the hearing on his motion for a new trial that the appellant has completely failed to reveal any undue coercion by counsel to force an involuntary plea of guilty from him. It is readily apparent that the appellant's trial counsel had a genuine concern for his client's life and held a well-founded belief that the State's evidence was sufficient to support the death penalty should the appellant elect to go to trial on a plea of not guilty. Trial counsel put the facts to the appellant as objectively as possible along with his recommendation, and the appellant voluntarily chose to plead guilty rather than risk going to the electric chair. The Supreme Court of the United States has held that an otherwise valid guilty plea is not involuntary because it is induced by the defendant's desire to limit the possible maximum penalty to less than that authorized if there is a jury trial. Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970).
In Bordenkircher v. Hayes, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), the Supreme Court stated:
"By hypothesis, the plea may have been induced by promises of a recommendation of a lenient sentence or a reduction of charges, and thus by fear of the possibility of a greater penalty upon conviction after trial....
"While confronting a defendant with the risk of more severe punishment clearly may have a `discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable'and permissible`attribute of any legitimate system which tolerates and encourages the negotiation of pleas.' ... It follows that, by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forego his right to plead not guilty."
(Citations omitted.)

B
We do not agree with the appellant's contention that the trial court coerced him into entering a guilty plea by overruling his motion for a continuance. On the date of the appellant's arraignment on the instant charge, his trial counsel had requested a continuance until final disposition of the appellant's prior first degree murder conviction which was in the process of being appealed. The appellant therefore contends that since the continuance was not granted he could not testify in the instant trial without fear of exposing the prior conviction to the jury. Consequently, he contends that the trial court left him with no choice but to plead guilty.
A motion for a continuance is addressed to the sound discretion of the trial court whose ruling thereon will not be reversed on appeal absent a showing of abuse of discretion. Rogers v. State, Ala.Cr.App., 365 So.2d 322, cert. denied, Ala., 365 So.2d 334 (1978); Duncan v. State, Ala.Cr.App., 355 So.2d 745 (1978). We find no abuse of discretion on the part of the trial court in refusing to continue the instant case until the prior conviction could have been disposed of on appeal.
Section 12-21-162, Code of Ala.1975, provides in pertinent part:
"As affecting his credibility, a witness may be examined touching his conviction for a crime involving moral turpitude, and his answers may be contradicted by other evidence."
Had the appellant taken the witness stand, he could have been impeached by showing his prior conviction on the murder charge.
*284 The fact that such conviction was being appealed would have no bearing on its use for impeachment purposes. Waters v. State, Ala.Cr.App., 357 So.2d 368, cert. denied, Ala., 357 So.2d 373 (1978). In Waters the denial of a motion for a continuance was challenged on the same ground as here. There, the motion for a continuance was based upon a pending motion for a new trial on a prior conviction in another county which the State would seek to introduce for impeachment purposes if the appellant testified during his current trial. In that case we found no abuse of discretion on the part of the trial judge in denying a continuance, and we reach the same conclusion in the instant case. Appeals and review on certiorari often take years before a final disposition is made in a criminal case. If the rule were otherwise than announced in Waters, supra, defendants could have cases continued for years until final disposition was made on any prior conviction which could be used for impeachment purposes. Such a rule would be foolhardy and unworkable. It would allow any criminal defendant with prior convictions arising out of his own criminal misconduct to perpetuate appeals in those cases thereby delaying and in some cases evading a trial on his most current misconduct. Such is not the law in this state.
We likewise find no coercion on the part of the trial court in requiring the appellant to make a written admission of his guilt and to "recite a factual basis" for the acceptance of his guilty plea. It is incumbent upon a trial judge in accepting a guilty plea to determine not only that the plea was intelligently and voluntarily made, but that there was a factual basis for that plea. For example, if a defendant is to enter a guilty plea to a charge of robbery, the trial judge should ascertain that the appellant committed a robbery rather than a mere larceny or lesser offense and was not pleading guilty out of ignorance as to the elements of the offense. See: Boykin v. Alabama, supra; Brady v. United States, supra; Henderson v. Morgan, 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976).
Here, the appellant's written statement furnished the trial court with a factual basis to determine that the appellant had committed the crime for which he was charged. Requiring the appellant to make a written admission of his guilt is no more prejudicial to him than the requirement that he stand in open court and make a verbal admission of his guilt on entering a guilty plea. The trial court's requirement for the written statement was not made to coerce the appellant into pleading guilty. An inquiry had already been made in his behalf to the trial judge to see if such a plea would be accepted. The trial judge merely required, as a condition to his acceptance of the guilty plea, that the appellant acknowledge his guilt in writing. In fact the appellant's written statement was sealed, was never admitted into evidence in the trial, and was only presented into evidence on the hearing on the appellant's motion for a new trial. We therefore find no action on the part of the trial court which coerced the appellant into making an involuntary admission of his guilt.
In any event the appellant's voluntary guilty plea waives any nonjurisdictional defect including the denial of a pretrial motion for continuance. Lancaster v. State, Ala.Cr.App., 362 So.2d 271, cert. denied, Ala., 362 So.2d 272 (1978); Barnes v. State, Ala.Cr.App., 354 So.2d 343 (1978).

III
The appellant contends that he was ineffectively represented at trial. He bases such contention upon the failure of his trial counsel to talk to witnesses, investigate the facts of the case, or move to suppress the transcript of the appellant's conversation with his cellmate, Robert Nipper.
We have previously discussed the reasons given by the appellant's trial counsel for failure to pursue the only witness suggested by the appellant. That witness, which trial counsel referred to as a "jailbird witness," could have given no testimony concerning the commission of the offense or possible alibi of the appellant. That witness could have only testified as to whether *285 or not the sheriff had attempted to induce him to obtain incriminating statements from the appellant while in jail. Trial counsel's reason for not pursuing such a witness appears to be valid and reasonable, and we cannot say that his judgment in that regard constituted ineffective assistance of counsel.
We have likewise discussed pretrial motions filed by trial counsel in this case. Those motions show considerable preparation on the part of those attorneys. In fact, had the motion for discovery not been filed and the appellant had gone to trial on a not guilty plea, the surprise testimony of Robert Nipper would have been truly devastating to the appellant. The fact that his trial counsel learned of Nipper's testimony and the existence of a tape recording, in all probability, saved the appellant's life.
Likewise, the letter to appellant from his trial counsel, hereinabove set out, indicates great familiarity with the facts and circumstances of the appellant's case and clearly evidences that his attorneys had investigated the case, obtained and analyzed evidence, and had exercised their professional judgment in making recommendations to him concerning his plea. The appellant has failed to show that his representation by trial counsel was so inadequate and ineffective as to make his trial a farce, sham, or mockery. Boswell v. State, 290 Ala. 349, 276 So.2d 592 (1973).
We also fail to find the appellant's trial counsel to have been ineffective for failure to move to suppress the transcript or tape recording of the appellant's conversation with his cellmate, Robert Nipper. Appellant's counsel on appeal contends that the conversation could have been suppressed pursuant to Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).
Neither the recorded conversation nor a transcript of that conversation was admitted into evidence in the State's case in chief. Whether the State intended to introduce either of those items had the appellant entered a plea of not guilty is mere speculation. The State could have very well presented its testimony in such a trial as it did in the instant proceeding by way of Robert Nipper himself as a live witness. In such a case there would have been no violation of the principle set out in Massiah, supra.
The record on the hearing on motion for a new trial shows without dispute that Nipper voluntarily went to the police and informed them of the appellant's incriminating statements. The appellant had confessed to Nipper and had discussed the possibility of Nipper escaping and committing one or two similar murders for him before any recording was made at the request of law enforcement officers. The State therefore would not have to rely upon a tape recording made by the cellmate in order to present valid evidence of the appellant's incriminating statements or other evidence connecting him to the crime. See: Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972).
Even if the appellant's trial counsel had been wrong in his judgment concerning the effect or admissibility of Nipper's testimony, the mere misjudgment of counsel on such a matter is not sufficient to render the appellant's guilty plea unintelligent or to entitle him to disavow his admission of guilt. The instant record shows that the appellant's trial counsel acted within the range of competency required of attorneys representing defendants in criminal cases. Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970).
It was likewise highly competent for the appellant's trial counsel to advise him of the possibility that his prior criminal acts could be admitted into evidence against him. It has long been the law in this state that prior criminal conduct of an accused of a similar nature to the instant charge is admissible to prove identity, common plan, or design. Gamble, McElroy's Alabama Evidence, § 69.01, et seq. (3d ed. 1977); Lee v. State, 246 Ala. 69, 18 So.2d 706 (1944). Where a crime has been committed by some novel, peculiar, or unusual means, evidence of recent similar acts *286 or crimes by the accused which were committed by the same means or in the same manner are admissible to prove the identity of the accused as an inference from the similarity of methods. Wilder v. State, 30 Ala.App. 107, 1 So.2d 317 (1941); Hogue v. State, 54 Ala.App. 682, 312 So.2d 86 (1975).
We find a definite legal basis for trial counsel's conclusion that both Nipper's testimony and the appellant's prior similar crimes could possibly be used against him in the event he went to trial on a plea of not guilty. The appellant's trial counsel believed the State's case to be strong against his client. Confronted with the choice between life and death, the appellant quite logically chose life. When his plea is viewed in light of the evidence against him, which substantially negates his present claim of innocence, we can find no fault with the advice his trial counsel gave him in recommending the guilty plea. Effective assistance of counsel does not mean that counsel must be without error. What appellant now claims to be error appears to us to have been a wise trial tactic on the part of his trial counsel at the time. Taylor v. State, 291 Ala. 756, 287 So.2d 901 (1973).

IV
The appellant's contention that our review of this case should be governed by Rule 45A, Alabama Rules of Appellate Procedure, is incorrect. Rule 45A has no applicability because there was no imposition of the death penalty in this case. That rule applies, by its express terms, "in all cases in which the death penalty has been imposed." In any event the "plain error" rule would avail the appellant no relief for we have searched the record and we find no error "plain" or otherwise which would merit a reversal of the appellant's conviction.
AFFIRMED.
All the Judges concur.
TYSON and DeCARLO, Judges, concurring specially.
While we wish to make clear to the Bench and Bar of this State that we continue to adhere to the views expressed by both of us in Prothro v. State, Ala.Cr.App., 370 So.2d 740, at page 748 (1979); Youngblood v. State, Ala.Cr.App., 372 So.2d 34, at page 37 (1979); and Evans v. State, Ala.Cr.App., 362 So.2d 1284 (1978), overruled, Evans v. State, Ala.Cr.App., 372 So.2d 37 (1979), nevertheless, we are of the opinion that Judge Bookout has correctly stated the law with reference to the facts and issues disclosed by the record in the instant cause.
We therefore join in the affirmance of this cause.