LEIGH M. CLARK, Retired Circuit Judge.
This is an appeal from a judgment of conviction and sentence in accordance with the verdict of a jury finding defendant guilty of murder in the second degree of John Alvin Abrams and fixing punishment at imprisonment for ten years and one day. The indictment charged murder in the first degree; defendant had been previously found guilty of murder in the second degree by a jury that fixed his punishment at imprisonment for twenty years. On appeal from the former judgment, the judgment was affirmed by the Alabama Court of Criminal Appeals, 402 So.2d 1052 (Ala.Cr.App.1980), which judgment was reversed by the Alabama Supreme Court, 402 So.2d 1060, (Ala.1981), and after remandment to the Alabama Court of Criminal Appeals, the judgment of the trial court was reversed and the cause remanded (402 So.2d 1062 (Ala.Cr.App.1981)).
There is little difference between the evidence on the first trial and the evidence on the second trial, which is comprehensively covered by the opinion of this court on the former appeal, and there is no occasion for a repetition thereof. We think worthy of note, however, a matter which perhaps is insignificant — that the sole basis for the reversal of the judgment on the first trial was the argument of State’s counsel in criticism of the defense in not calling defendant’s wife as a witness for the defendant in corroboration of the defendant’s testimony that he did not kill the alleged victim, while on the second trial the defendant did not testify and his wife did testify when called by the defense, substantially as defendant had testified on the first trial.
Appellant presents three separate issues as bases for a reversal. We proceed to consider them in the order presented in appellant’s brief.
I
The case came on for the second trial on a Tuesday, February 16, 1982, after having been set for trial on the preceding day but not being called for trial on that day. At 8:47 A.M. on February 16, defendant’s attorneys filed a written motion for a continuance of the case by reason of an article that appeared in the Talladega Daily Home-Sylacauga News. A copy of the article was attached to the motion for a continuance and is as follows, under the caption of “THATCH FOUND GUILTY; MURDER TRIAL CONTINUED”:
“TALLADEGA A second murder trial of Douglas Billingsley of Sylacauga, slated to begin Monday, was continued until 9 a.m. Tuesday, but Michael Thatch was tried and found guilty of robbery during a May escape of the Talladega County Jail.
“Billingsley was convicted in 1979 of second degree murder in the shotgun slaying of his next door neighbor, John Alvin Abrams, and sentenced to 20 years. “The sentence was upheld by the Criminal Court of Appeals, but was then reversed in August 1981, and the case remanded for a new trial.
“Abrams was 71 years old when he died from a shotgun blast to the head. Bill-ingsley was 68 years old at the time. The incident occurred at Billingsley’s home at 701 Park St., Sylacauga.
“SELECTION OF A jury was slated to get under way Monday. However, because Monday was a state holiday, assistants to the attorney general who are to prosecute the case did not appear, according to Supernumerary Judge William Bibb. Bibb continued the case until 9 a.m. Tuesday.

“Billy Wayne Roberts and Edmond Earl Payne, who fled the jail both times with Thatch, already have been convicted of *604 escape, kidnapping, and robbery charges from the first escape. Roberts, a convicted murderer, was handed down a life sentence and two sentences of life without parole.
“Thatch was serving life without parole for a crime committed in Madison County, but was in the Talladega County Jail awaiting court action on charges here when the trio escaped.”
The first matter heard at the call of the case at 9:00 A.M. was defendant’s motion for a continuance. In a colloquy among the court and counsel for the parties it was agreed that the copy of the newspaper article would be considered as evidence. Thereupon, the following occurred:
“THE COURT: Do you have any other evidence on this motion?
“MR. LOVE: [Defendant’s attorney]: I’d call the members of the jury if it’s necessary, Your Honor, to prove how many of them has read it. How many has read it this morning, and how many has had it in the court room over there now at this time.
“THE COURT: Well, I think we can assume this. I believe I’m right. You gentlemen speak up if you disagree with me. We can assume that you are not going to be able to put a jury in the box that does not contain a substantial number of persons who have read this article.
“MR. LOVE: That’s true, sir.
“THE COURT: Now, with that assumption or that stipulation, if any of you want to object to that, just object to it now. With that stipulation I think we can save putting each juror on the witness stand. Now, do you have anything else you want to present?
“MR. LOVE: No, sir, not with that stipulation, Your Honor.
“THE COURT: Do you have any evidence you want to present opposing this motion?
“MR. VALESKA [Assistant Attorney General]: No, sir, Judge. I don’t have any evidence. I would ask the Court not—
“THE COURT: Well, we are just going to say the evidence is closed. Now, we are going to let the defendant’s side argue the motion, if they choose to do so.”
After considerable argument by the attorneys for the parties as to the motion for a continuance, the court overruled the motion with a statement by the trial judge as follows:
“... Therefore, I am going to give the reason — in fact, two reasons that appeal to me — why I’m going to deny this motion for a continuance.
“Number one, the evidence on the motion must show, or at least raise a presumption, that the defendant has been harmed by the publicity. To put it another way, the burden rests upon the defendant on asking for a continuance to show that injustice would result if he didn’t get a continuance.
“The other reason is that I’ve read the article and the article substantially states, in addition to what has already been brought out, that the gentleman took an appeal and the Supreme Court of the State of Alabama reversed the case and ordered a new trial. And I’m just not at all satisfied, in my own mind, that anybody would be prejudiced by that or would be unable to sit in the jury box without any preconception. The paper says the case was reversed and a new trial was ordered. That, in itself, is a notice to everyone that the defendant did not get a fair trial on the first trial.... ”
Appellant cites splendid authority in arguing his contention that the denial of defendant’s motion for a continuance constituted prejudicial error, but he does not cite any applicable authority to support him. In the cited case of Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the ruling of the trial court under consideration was its denial of appellant’s motion for a change in venue. As shown by the opinion in the case at 366 U.S. 725, 81 S.Ct. 1644:
“... A reading of the 46 exhibits which petitioner attached to his motion reveals that a barrage of newspaper headlines, articles, cartoons and pictures was un *605 leashed against him during the six or seven months preceding his trial.... These stories revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war.... Finally, they announced his confession to the six murders and the fact of his indictment for four of them.... ”
 It is true, as argued by appellant, that publicity as to an approaching or existing trial can be so extraordinarily unfavorable to a party as to be presumptively prejudicial to such party. Thus, in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), according to appellant, a presumption of prejudice to defendant’s right to a fair trial was found to exist by reason of the broadcast three times in the rural community from which the jury was drawn of a film of defendant’s confession. Also, as argued by appellant, it was held in Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), that “jurors apprised of a criminal’s prior record by news sources are presumed to be prejudiced.”
We see no basis for any presumption of prejudice to defendant arising out of the newspaper article quoted above. It is a correct recital of past and existing facts with reference to the case. Even so, it could have been prejudicial to defendant if the facts stated tended to show defendant’s guilt or otherwise adversely reflected upon him. In our opinion, it did not do so. We think the trial court viewed the matter realistically and correctly. On both trials there was large number of witnesses, largely the same witnesses on each trial. Irrespective of what was stated in the news item, a postponement of the second trial for even an extraordinary length of time would not have prevented any of the jury selected to try the case from knowing that there had been a previous trial of the case. The fact that there had been a previous trial of itself furnished a proper basis for cross-examination of most of the witnesses as to some of their testimony on the previous trial. Certainly the jurors were intelligent enough to know that he had not been acquitted on the previous trial, that, if he had been, he could not be tried again. In the light of these facts, facts that the jury would have known irrespective of the news item, it cannot be said that the news item was any more unfavorable to defendant than it was favorable to him.
In commendable zeal by appellant’s counsel on behalf of his client, he states in his brief:
“... Indeed, had a prosecutor or a witness in the instant trial uttered, in the presence of the jury, that the defendant had previously been found guilty of this same charge, a mistrial would have been mandated. See ... [a number of cases appearing in the following]; Anno. Sect. 13, 31 A.L.R.2d 417, 428 (1953).”
Our consideration of the cited section of 31 A.L.R.2d 417 and the corresponding section in A.L.R.2d Later Case Service (1981) convinces us that neither the cited annotation, nor any of its contents nor any of the cases cited are referable to the jury’s being informed as to the previous conviction of the defendant on a former trial in the same case. Some of the cited cases do involve a former conviction of the defendant that could be classified as the “same” charge in the broad signification of the word “same” but not in the sense that it would encompass a previous conviction in the same case in which a defendant is in the process of being tried a second time. The cases upon which appellant relies for support, in respect to his contention now under consideration, pertain to previous ■ convictions in cases other than cases in which defendants had been previously tried.
We do not disagree with the action of the trial court in overruling defendant’s motion for a continuance, but even if we did, the trial court should not be reversed. A motion for a continuance is addressed to the sound discretion of the trial court, and the exercise thereof will not be disturbed in the absence of a clear abuse by the trial court of such discretion. Fletcher v. State, *606 291 Ala. 67, 277 So.2d 882 (1973); Graham v. State, 403 So.2d 275 (Ala.Crim.App.1980) writ quashed, Ex parte Graham, 403 So.2d 286 (Ala.1981); Wilson v. State, 395 So.2d 1116 (Ala.Cr.App.1981).
II
The second issue presented by appellant pertains to the action of the trial court in overruling defendant’s motion captioned a “MOTION TO SUPPRESS ILLEGALLY SEIZED EVIDENCE” and defendant’s motion captioned a “MOTION IN LIMINE,” in which defendant moved the court to direct the prosecution to refrain from asking questions or commenting upon, inter alia, “Any firearm or firearm ammunition seized or located in defendant’s place of residence subsequent to the death alleged in the indictment” and “Any tangible item seized from the defendant’s person during his incarceration .... ”
There is considerable difference between the way the search and seizure of items in the house where the recently deceased body was readily observed by the police upon their being called to the residence were questioned on the first trial and the way defendant questioned such search and seizure on the second trial. However, in large part, the question presented now, as well as the question presented then, was resolved adversely to appellant by the following language of this court in Billingsley v. State, supra, at 402 So.2d 1059, 1060:
“Relying on Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the defendant contends that a shotgun found in his bedroom closet was illegally seized. Mincey held that there was no ‘murder scene exception’ to the warrant requirement of the Fourth Amendment. ‘[The warrantless search of Mincey’s apartment was not constitutionally permissible simply because a homicide had recently occurred there.’ However, the Supreme Court did not condemn all investigating and warrantless searches .at the scene of the crime.
“ ‘We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises.... And the police may. seize any evidence that is in plain view during the course of their legitimate activities.’
Mincey, 98 S.Ct. at 2413-14.”
The fact that a recently fired shotgun was found in the defendant’s bedroom closet was doubtless the prime damaging item found in defendant’s residence. Although the closet was closed and the gun was not in plain view until the officers opened the door, it is clear that the situation the officers observed presented a puzzling question as to whether a “killer” other than or in addition to the defendant, or perhaps a victim other than or in addition to Mr. Abrams, was in the residence at the time. Probably the best place for any other killer was in the bedroom closet of the defendant. In our opinion, the opening of the closet door under the emergency circumstances without any search warrant was not in violation of defendant’s Fourth Amendment right to security “against unreasonable searches and seizures.” Furthermore, we are convinced that the undisputed evidence shows that the officers were invited to the residence of defendant by Mrs. Black at the direction of the defendant, which Mrs. Black accomplished indirectly by calling the telephone operator and telling her to report to the police that a man had been killed. She was vague in her testimony as to what she told the operator, but it is clear that in a few moments thereafter police were at the residence of defendant and the residence of Mrs. Black and that they proceeded promptly to enter the residence of defendant without any objection or remonstrance whatever, and the *607 first noteworthy object that came to their view was the then recently deceased body of Mr. Abrams.
Defendant’s motion to suppress evidence and his motion in limine were heard jointly, apparently with the consent of all concerned. There was lengthy testimony consisting almost exclusively of that of law enforcement officers testifying on call of the defendant, interspersed by objections or comments of the attorneys and the court, which was concluded as follows:
“MR. WOODS: [Attorney for defendant]: That’s all we have, Judge.
“THE COURT: Do you want to argue this motion?
“MR. LOVE: [Attorney for defendant]: No, we submit it to the U.S. Supreme Court.
“THE COURT: Well, I’m going to overrule the U.S. Supreme Court on the basis of the Court of Appeals of Alabama. They say you can do it, so I’m going to overrule your motion.
“MR. LOVE: To which we have an exception to.
“THE COURT: Very well.
“MR. WOODS: Yes, sir, we except to Your Honor’s ruling.”
We disapprove of the language of the trial court, “I’m going to overrule the U.S. Supreme Court on the basis of the Court of Appeals of Alabama. They say you can do it, so I’m going to overrule your motion.” The reference is doubtless to that part of the opinion of this court in Billingsley v. State, supra, at 402 So.2d 1059, 1060, wherein this court distinguished the facts in the instant case from the facts constituting the prolonged search in Mincey, supra, and further stated, “Additionally, the record shows that, when the shotgun was offered into evidence by the State, there was no objection.” We look to the transcript for the first reference on the trial involved in the instant appeal to the shotgun and find it during the direct examination of Officer Haye as follows:
“Q. Officer Haye, did you see any items that were found in the defendant, Mr. Billingsley’s house that evening?
“MR. WOODS: May it please the Court, we object on the grounds earlier stated to the Court.
“MR. LOVE: That question is so general.
“THE COURT: I will sustain the objection to the particular question or to the form of the question.
“MR. WASDEN: I’ll rephrase the question, Your Honor.
“Q. While you were in the house, were any shotgun shells found?
“A. Yes, sir, it was.
“Q. And was a shotgun found in the house that evening, Officer Haye?
“A. Yes, sir.
“Q. And did you happen to see Captain Bryant examine that shotgun?
“MR. LOVE: May it please the Court, we object.
“MR. WOODS: We object to his leading the witness and asking for a conclusion.
“THE COURT: Well, that might be leading to a degree, but I don’t think it’s particularly — I don’t think it’s harmful. I’ll overrule that objection.
“A. Yes, sir, it was in the closet in the bedroom.
“Q. Well, did you see Captain Bryant examine the shotgun?
“A. Yes, sir.
“Q. In what way did he examine it?
“A. He picked it up out of the closet and smelled of it and then laid it on the bed.”
It is to be readily observed from the matter last quoted that evidence as to the shotgun, that it was found in the closet of the bedroom and that an officer smelled it and laid it on the bed, was introduced in evidence without any objection by defendant. It then became a proper subject of further inquiry by both the State and the defendant. Whatever right of the defendant to security against unreasonable searches and seizures was violated by the search of the house and the seizure of the shotgun, there was no error prejudicial to defendant in any of the rulings of the trial court on the subject.
*608 III
Appellant’s third contention for a reversal pertains to the action of the court in sustaining the State’s objection to proffered evidence by defendant of the hospital records of Mrs. Wilma Black, a witness for the State and a neighbor of defendant whom he had told that he had shot someone and whom he asked to call the police. The records indicate that Mrs. Black was in the hospital during a period commencing November 23, 1978 “with a long history of abuse of Darvon,” and defendant proposed to show by expert testimony that “Darvon affects a person’s ability to perceive things by sight and hearing, and, further, it affects their ability to relate.”
The witness had admitted that she was in the hospital about ninety days before the homicide involved in the instant case, but she stated that she was in the hospital for phlebitis and her doctor had prescribed Darvon for her to take every six hours and she was complying with such prescription at the time of the homicide. The scope of the evidence proffered by defendant broadened while the presentation of the matter to the court in the absence of the jury continued. It developed that the witness was again admitted to the same hospital on November 16, 1979, and discharged on December 6, 1979, that she was again admitted on January 18,1980, and discharged on February 1, 1980, and that the record of the last admission listed a history of “chronic abuse— drug abuse — and, further, ... Mrs. Black at that time suffered symptoms of withdrawal from Darvon and Meprobamate.” After extended argument by counsel as to the admissibility of the hospital records for the three mentioned hospitalization periods, the trial court said:
“I’m going to rule them all out on the ground of remoteness. That’s a part of the reason, and the other part of why I’m moving them out is that they do not actually show or do not tend to show, in my consideration, in any material way that at the time of the incident, which is the subject of this prosecution, the lady was taking more than one Darvon tablet every 6 hours, which she testified to herself, and, therefore, there would not be impeachment.
“Now, let me say this: Of course, I don’t have anything to do with whether something is true or false. That’s up to the jury eventually and finally. The lady is a little eccentric in her statements. I mean, she doesn’t talk just like a lawyer does. If one lawyer says she does not testify in the language of the Supreme Court Reporter, but my impression of her is that she is doing the best she can, and unless something substantial could be brought forward to disprove that or shake that initial idea, she should at least be entitled to the same respect that all of us are entitled to, that is, just as a fellow human being.
“MR. WOODS: We except to Your Hon- or’s ruling.
In Gamble, McElroy’s Alabama Evidence, § 141.01(3), it is stated:
“A witness’ addiction to a narcotic drug is not admissible to impeach him unless one of the following are found: (1) that he is under the influence of the drug at the time of his testifying, (2) that he was under the influence of the drug at the time of the event of which he testifies or (3) that his mind is generally impaired by the habitual use of narcotics [sic] drugs.”
The case relied upon for the statement just quoted is Standard Oil Co. v. Carter, 210 Ala. 572, 98 So. 575 (1923), in which the following is also stated:
“... The question to Dr. Greer, as to whether or not the plaintiff had not for many years prior to the injury and subsequent thereto been an ‘opium habitue,’ did not show that he was under the influence of the drug at the time of the injury or at the time of testifying. Nor did it show that the habit was so excessive as to have impaired the memory of the plaintiff. True, it was essential to prove the habitual use of opium as a predicate to establish the extent of the same, but in order to put the trial court in error, the question should have been followed up by a statement or assurance that defendant *609 expected to show that the habit was so excessive as to impair the memory of the plaintiff.”
In appellant’s brief, he urges that the offer made by him met the requirement set forth in the last sentence of the statement quoted above from Standard Oil Co. v. Carter, but we do not think so. The following is the offer upon which he relies:
“Judge, we would make an offer that these records would establish, as set out in MeElroy, that the witness was under the influence of these drugs at the time of the event of which she testifies, and, further, we would offer these showing her habitual use of these drugs that her mind is generally impaired by the habitual use of narcotics drugs. We would further offer to prove that she was under the influence of one or the other of these drugs at the time of her testimony in this case.”
We think rather that by defendant’s proffered evidence of the contents of the hospital records of the witness, he was offering a matter from which it could be argued that the witness “was under the influence of a drug at the time of the injury or at the time of testifying or that it was so excessive as to impair the memory of the [witness],” but there was no offer by defendant’s counsel to show, or assurance that he would show by other competent evidence, that, according to the hospital records, when considered with the other evidence in the case, the witness sought to be impeached was “under the influence of the drug at the time of the injury or at the time of testifying ... or that the habit was so excessive as to impair the memory of the [witness].”
In our opinion, the trial court properly appraised the proffered evidence and the proposed impeachment of the witness Mrs. Black and its ruling adverse to defendant on the subject did not constitute prejudicial error.
CONCLUSION
We have not endeavored to convince ourselves as to the factual question as to whether the appellant killed Mr. Abrams. We know of no reasonable contention to be made, however, under the undisputed evidence, other than that the defendant or some other man in defendant’s residence at the time killed Mr. Abrams. According to some of the evidence, which has not been definitely disputed, another man was in the house a short time prior to the death of Mr. Abrams, a man who has not testified in the case and whose whereabouts at the time of the homicide is not clearly shown by the evidence. We find no claim by either of the parties, or anyone else, that he was the killer.
In the final analysis, we find that there is no basis for reasonable belief that any person or group of persons, without actual knowledge of the identity of the killer, is in a better position to determine the guilt or innocence of the defendant than was the jury that rendered the verdict in the case.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.