Appellant was indicted by the grand jury of Covington County, Alabama, for assault with intent to murder Henry Frazier. In the presence of counsel, appellant was duly arraigned, entering a plea of not guilty to the charge against him. A jury found appellant guilty of assault and battery and fined him five hundred dollars. Adjudging appellant guilty in accord with the jury's verdict, the trial court imposed the fine set by the jury and as additional punishment the Court sentenced appellant to five months and twenty nine days in the Covington County Jail.
This incident arose from a family dispute over a land line. The victim in the case was appellant's eighty-three-year-old uncle. It is only to these two facts that the parties agree, all other evidence surrounding the fracas being in hopeless conflict.
Henry Frazier, the victim, testified that on August 20, 1977, appellant and his father, J.D. Frazier, Henry's brother, drove up to the house in a Volkswagen. Appellant's four-year-old son accompanied them. Frazier's home was on the Elba and Andalusia road, near Sasser's Cross Roads in Covington County.
When appellant and his father arrived at the house, Frazier was sitting on the porch. Appellant walked up and sat down beside Frazier, while his father, known as "Dee" to the family, sat down beside a big tree in the front yard. Frazier's wife was "going and coming," but she too sat out on the porch for some time also. Shortly after appellant sat down, he sent his son to the car to bring back a quart of whiskey.
Henry Frazier had not invited his relatives over to visit and when appellant began "cussing about every breath he drawed," Frazier asked Dee to take appellant home before there was trouble. Appellant then told Frazier that his mother had sent him there "to do a job," and appellant was going to do it. *Page 362 
Henry Frazier asked Dee again to take appellant home, but appellant spoke up, saying "that is what we come up there for is trouble." Appellant then called Henry Frazier a "son-of-a-bitch," whereupon Henry Frazier hit him with his fist. A general melee ensued, appellant and victim falling off the porch, when they "tangled up." Appellant struck Frazier on the head and in the mouth, Frazier falling again. While Henry Frazier was on the ground and unable to get up, appellant began to kick him, the reason for which Henry Frazier testified, "I have been hobbling today."
At this point, Mrs. Frazier, seventy-six years of age, walked out of the house with a small pistol. Appellant tried to take the pistol away from his aunt and struck her on the head. Appellant and his father then left.
Henry Frazier further testified that he required hospitalization for four days. He also identified two photographs depicting himself wearing a full length cast on his left leg. These photographs were received in evidence without objection.
Mary Lou Frazier testified that she was the victim's wife. On August 20, 1977, as Mrs. Frazier was about to take a bath, the doorbell rang. Mrs. Frazier opened the door and saw appellant standing on the walk with a quart of whiskey in his hand. Appellant was drunk, cursing, and he wanted to go inside the house. However, Mrs. Frazier told him to wait outside and Mr. Frazier would be out in a minute.
Appellant and Mrs. Frazier then sat down on the porch. The record reflects the following occurred:
"Q. And who was he cussing?
 "A. He was cussing — He first began on Mr. Reeves, calling him all kinds of son-of-a-bitches.
"Q. Mr. who?
 "A. Mr. Doug Reeves, all kinds of son-of-a-bitch, and I begged Dee to take him home and he looked up at me, he said, shut your god-damned mouth, you god-damned old bitch, said my daddy knows what I come up here for. My mother sent us up here to do a job and we are going to do it before we leave.
 "Q. If you will, if a ruckus started there or if a fight started, how did it start?
 "A. When he just come in a cussing about the land, he said he come up there and we were sure going to have to sign a deed, that we had deeded some land away that didn't belong to us. And we didn't have no land there to deed. We had done deeded it about seven or eight years before then. We didn't have no land down there to deed.
"Q. He said that you were going to sign a deed?
 "A. He said we had to, or he was going to beat — I think, I wouldn't be for sure, he said he was going to beat something out of us. He said so much, I couldn't tell you what all he did say.
 "Q. All right, what brought on the first blow and who hit the first blow.
"A. Well, Henry hit the first blow.
"Q. Well, what brought it on.
 "A. He called Donald a god-damned-son-of-a-bitch and he called Henry a god-damned-son-of-a-bitch, and when he did Henry hit him in the mouth, and I got up and tried to get Dee to take him on but Dee wouldn't do it. He just stood there and laughed about it. And so I got up and I begged him, and I cried and I begged him, I said Dee take him off. And he had his bottle in his hand and he was hitting Henry in the breast with his fist. Just hitting him and I said Dee please take him off, before Henry has a heart attack. He said you shut your mouth, you god-damned-old-bitch, my daddy knows what I come up here to do. And my mother sent me up here to do it and I'm going to do it.
"Q. All right, what happened then?
 "A. And then is when I went in the house and got the gun and come out and pointed it at him and told him if he didn't quit I was going to shoot him, with it. So he pushed Henry over on me and hit me right there with his fist, just as hard as he could. And when he did, I come around with the gun and meant to hit *Page 363 
him. If I didn't hit him, it wasn't because I wanted to, I tried. And then he picked me up and throwed me out in the yard and he jumped out there on me and then Henry knocked him off of me, and Dee was sitting out there laughing about it. And he had me down to where I couldn't get up. He had Henry down there kicking him just as hard as he could kick him and all. So I crawled back to the door and got on the inside and I got to the telephone. It is just a little ways, my kitchen, and I called the operator and told them to get the police for me and I don't know when they left. I just don't know. I don't know no more when they left than nothing."
Mrs. Frazier further testified that both she and her husband were in the hospital for a week.
Mr. Frazier's hospital records were then introduced into evidence through Bernice Forman, the custodian of records for Mizell Memorial Hospital in Opp, Alabama.
Dr. J.E. Dunn testified that he was a general practitioner in Opp, Alabama. On August 20, 1977, Dunn examined Henry Frazier at Mizell Memorial Hospital. At that time Mr. Frazier was "quite upset," and complaining of pain in his left knee and right hand. Dunn X-rayed Mr. Frazier and admitted him to the hospital. Dr. Dunn turned the patient over to Dr. Lee who was his regular physician.
Dr. A.V. Lee testified that he examined Henry Frazier at Mizell Memorial Hospital on August 21, 1977. Lee stated that Mr. Frazier had suffered a fracture of the left femur just above the knee. Lee also noticed swelling in Mr. Frazier's right wrist; however, no fracture was present there. Mr. Frazier had had difficulty with arteriosclerosis in the past.
At this point the State rested its case and appellant made the following motion, which was denied by the trial court.
 "MR. PRESTWOOD: May it please the Court, at this time we move that Your Honor exclude the evidence of the State, and the State has rested, of course. And as grounds for our motion to exclude the evidence and to discharge this Defendant we say as follows: One, the State has not made out a case. Has not presented facts to support the charge of assault with intent to murder. The injured party, the prosecuting witness Henry Frazier testified in your presence this morning, that he fell. He testified further that LaDon might have pushed him. He wasn't certain. Or in substance that. He testified further that he wouldn't say, when I asked him directly that question, would he answer under oath that LaDon hit him, knocked him off or shoved him. He dropped his head and said he wouldn't answer it, he just didn't remember. We have the testimony of Dr. A.V. Lee, whose qualifications were recognized by all parties and who stated that the injured party Henry Frazier, was suffering from arteriosclerosis and that a patient suffering from arteriosclerosis, especially at his age, would have trouble recalling. And some of them did. Which means, the way I understand it, that his memory would not function as well as somebody that didn't have arteriosclerosis, at the age which he has now obtained. And we argue further as a ground that there is no felonious intent involved. That a conviction with assault with intent to murder has got to meet the test had the person died the charge would have been murder. And I think it is clear to everybody at the conclusion that the first blow was struck out there — we are getting now, away from just talk Your Honor, but on assault with intent to murder the first blow out there was struck by Henry Frazier by his own admission. The first and only weapon on the scene was not produced by LaDon Frazier, here, but by Mrs. Mary Lou Frazier of her own testimony. There is no evidence that LaDon Frazier made any remarks to the effect that he was going to knock anybody's head off or kill them or take their life. On the other hand there is evidence that she engaged in violence when she brought the gun out there and tried to knock his head off. That is what she said and she said it *Page 364 
twice. Now, I realize that motions to exclude the evidence are rarely granted, I understand that, but I also think it is our duty to point out to the Court that the elements required in proving the case of assault with intent to murder are not complete in this case.
"THE COURT: I deny the motion."
Aubry McGraw testified that he was a Deputy in Covington County. On the day of trial, McGraw went to the home of Henry Frazier and got a revolver from a chest of drawers in the house. Five cartridges, one of which was spent, were in the weapon.
Mary Lou Frazier was then recalled. Mrs. Frazier identified the revolver brought to court by McGraw as the pistol with which she had hit appellant. The spent cartridge had been fired by Herman Lord, the Fraziers' son-in-law, to check the weapon, after the incident on August 20, 1977.
Howard Easley testified that he was employed by the Covington County Sheriff's Department. On August 20, 1977, Easley went to Henry Frazier's home in response to a disturbance call. After arriving there, Easley went and spoke to appellant at Dee's house. Appellant's account of the incident as related to Easley is set out below:
"Q. Did you ask him to tell you what had happened?
 "A. Yes, sir, as he came out the door, I told him that I wanted to talk to him and that we were answering a call to a disturbance, wanted to talk to him in regards to this disturbance. At that time I advised him of his constitutional rights and asked him if he would tell me what was going on, what had happened.
"Q. Did he tell you?
"A. Yes, sir, he did.
"Q. What did he tell you?
 "A. He told me that he had been to, I believe the relationship in his uncle's house, Mr. Henry Frazier's house, with his father and that they had gotten into an argument. And particularly over a land line dispute and that in the course of the argument he and Mr. Frazier had become involved in some sort of tussle and that Mr. Frazier was pushed down.
"Q. Now, did he mention to you about a gun?
"A. Yes, sir, he did.
"Q. What did he say to you about the gun?
 "A. He said that Mrs. Frazier had gone in the house and gotten a gun and had come back out and this is the time that he had gotten into the tussle with Mr. Frazier.
 "Q. All right, when the gun came out, is when the tussle started, is that what he told you?
"A. That is what he told me, yes, sir.
 "Q. In other words the fight did not start until the gun arrived on the scene?
 "MR. McGILL: Object to his leading his own witness, Your Honor.
"THE COURT: Sustained.
 "Q. Well let's put it in sequence for the jury. I am confused myself. He told you about a gun being present. Did he tell you the fight started or the tussle started before or after the gun got there?
 "A. He told me that it started after the gun was presented.
"Q. All right, and what else did he tell you?
"A. That is basically all that he said."
Further, Easley testified that he did not see any abrasions or blood on appellant's head. Nor did he see any blood on appellant's clothing.
J.D. Frazier testified that he was appellant's father and the brother of Henry Frazier, the victim. On August 20, 1977, Dee and appellant stopped by Henry Frazier's home to see how he and his wife were getting along and talked twenty to thirty minutes. Then Mrs. Frazier asked how the land line dispute was progressing between Dee and Dudley Reeves. When Dee told Mrs. Frazier that he had gotten his spring back, she "commenced to raving" that it was not Dee's spring, but hers and Henry's. Mrs. Frazier ran inside the house and returned with a pistol which she snapped twice and then used to strike appellant on the head. When appellant attempted to get *Page 365 
the pistol, Henry Frazier "run up on Don [appellant] and was hung around Don's neck. And all three of them fell in the yard and that was it." Dee further testified that he and appellant then went home. Dee then identified two photographs, depicting a wound on his son's forehead, which were introduced into evidence. Further, Dee testified that no cussing or drinking was done by him or appellant.
Peggy Frazier, appellant's wife, testified that when appellant came home that night there "was blood pouring all down his face." Appellant required first aid, and Mrs. Frazier stanched the flow of blood with alcohol and cotton. Through testimony of appellant's wife, appellant's clothing which he wore the day of the incident was introduced into evidence. Blood and grass stains were on appellant's shirt and trousers.
Appellant then testified that he had never had any trouble with his aunt or uncle until August 20, 1977. Appellant's testimony was substantially the same as his father's. In summary, appellant testified that he did not initiate the trouble and that he struck neither his aunt nor his uncle. He denied that he was drinking at the time of the incident and said that he had not had a drink that day.
Several witnesses then testified to the good general reputation appellant enjoyed in the community for truthfulness and veracity and peacefulness.
This concluded the defendant's case.
In rebuttal, Howard Easley testified that appellant did not tell him about having been struck on the head by a pistol. Nor did Easley observe any wound or blood about the appellant's forehead.
Appellant first contends that the trial court cut short appellant's opening statement to the jury, denying him the right of explaining to the jury what he expected the evidence to show. From the record:
 "MR. PRESTWOOD: We expect the evidence to show that the feelings were going from Mr. and Mrs. Henry Frazier, down through their daughter, Herman Lord and his wife, and we expect the evidence to show that the sentiment and feeling has been so strong that up here in the Courthouse _ _ _
 "MR. McGILL: We object to this, Your Honor, that is not what he expects the evidence to show in this case.
"THE COURT: Yes, sustained."
It is well established that the scope and extent of counsel's opening statement to the jury in a criminal case are matters in the sound discretion of the trial judge and his ruling will not be overturned unless an abuse of discretion is shown. Baker v.State, 48 Ala. App. 535, 266 So.2d 340, cert. denied, 289 Ala. 739, 266 So.2d 344. Hooks v. State, 45 Ala. App. 221,228 So.2d 833. We find no such abuse here. From the tenor of appellant's other comments from his opening statement which appear in the record, it is apparent that appellant was attempting to interject prejudicial matters into the case. Furthermore, appellant presented no evidence at trial concerning the bias or prejudice of any party against him. The trial court committed no error in limiting counsel's opening statement to the jury.
Next appellant urges that the trial court erred to reversal by allowing in evidence the hospital records of the victim which showed how he came to be injured. In those records, the following statement by Dr. Lee appears:
 "This 82 year old male was brought into the hospital during the night after being involved in this trouble in his home by an intruder. They got into a scramble and in some way he injured his left knee and right wrist. He has swelling in these areas. His X-ray reveals questionable fracture off the inner aspect of the tibial. Wrist does not demonstrate a fracture that we can make out. He is complaining of being real sore with quite a bit of pain mainly in this knee. He was admitted to the hospital for further treatment."
The expert opinion testimony of a witness physician concerning the medical condition of a patient may be based in part upon present and past symptoms as related *Page 366 
to the physician by the patient. However, this rule does not allow the admission in evidence of the patient's statement concerning the circumstances of his injury or the question of responsibility for the injury. Gamble, McElroy's AlabamaEvidence, 3rd Edition, Section 110.01 (1), (2). The victim did not tell the doctor who inflicted the injuries on him. Appellant's name was not mentioned.
 Here there was no error. In Humphries v. State, 39 Ala. App. 316, 98 So.2d 625, we find the following excerpt:
 "Citing the principle that, while medical opinion evidence may be founded on a patient's statement to the physician, yet the patient's statement as related by the witness cannot go into `responsibility for the injury,' the defendant claims error in the following answer of Dr. Barnes on direct examination.
 "`A. I assumed from medical history that the girl had had some rough treatment, and had been forced to have sexual intercourse some 24 hours or maybe the afternoon before somewhere out near the edge of the county, but I don't remember which direction.
 "`Mr. Ralph Bland: We make a motion to exclude that statement.
"`Court: Overruled.'
 "We do not infer that the defendant was thereby associated with rough treatment or with forcing the girl to have intercourse. We construe Judge Bouldin's use in Lowery v. Jones, 219 Ala. 201, 121 So. 704, 706, 64 A.L.R. 553, of `responsibility for the injury' to mean identifying the person whom the patient claimed to be responsible for causing the injury. See Alabama Power Co. v. Edwards, 219 Ala. 162, 121 So. 543; discussion in Taylor v. Atlantic Coast Line R. Co., 232 Ala. 378, at page 381, 168 So. 181, at page 183; and McElroy, Law of Evid. in Ala., § 110."
Appellant also contends that additional error was committed by the trial court in overruling certain objections by appellant to questions asked of appellant's character witnesses by the State. From the record:
[Cross-examination of C.L. Carlisle]
 "Q. Have you ever heard any rumors or statements prior to August the twentieth, 1977, that would impute acts of violence toward Mr. LaDon Frazier?
"A. No, sir.
"Q. Never heard that?
"A. No, sir.
 "Q. Back before August the twentieth, 1977, had you heard he was charged with trespass after warning and destroying property of others?
"A. No, sir.
"Q. Haven't heard that?
"A. No, sir.
"Q. You live up there in the community with him?
 "A. I live over on 331 and I believe he lives in Andalusia here. His family lives over there.
 "Q. Well, you said you knew his general reputation in the community where he lives? What do you base it on? You have to base it on what you hear, don't you?
"A. Yes, sir.
"Q. But you haven't heard that?
"A. No, sir.
 "Q. All right, prior to August the twentieth, 1977, had you heard that he was charged with assault and battery?
"A. No, sir.
"Q. You haven't heard that, either?
"A. No, sir.
 "Q. Then you haven't heard all of the statements about him?
 "MR. JOHNSON: We object to that, Your Honor, as if there have been such statements.
"THE COURT: Overruled.
"MR. JOHNSON: We except."
Appellant argues that the State cannot prove a defendant's bad character by proof of specific acts. This rule of evidence is inapplicable to the facts of the case at bar.
A witness who has testified to the good general reputation of the accused may be cross-examined as to rumors derogatory to the accused. The purpose of the State's being able to do this is not to prove the bad *Page 367 
reputation or character of the accused, but to test the credibility of the character witness. A full discussion of this principle may be found in Gamble, McElroy's Alabama Evidence, 3rd. Edition, Section 27.01 (5), and cases there cited.
Finally, the sufficiency of the evidence to sustain appellant's conviction for assault and battery must be examined. This question is preserved for review through appellant's motion to exclude the State's evidence and motion for new trial.
An assault and battery consists of any touching of another in rudeness or anger. Englehardt v. State, 88 Ala. 100, 7 So. 154;Jacobi v. State, 133 Ala. 1, 32 So. 158. And an intent to injure is an essential element of the offense. McGee v. State,4 Ala. App. 54, 58 So. 1008.
Here the State's evidence, if believed by the jury to the required degree, was sufficient to sustain appellant's conviction. Appellant has no defense to his attack on Henry Frazier, though Henry struck the first blow. Riddle v. State,49 Ala. 389. Appellant's use of opprobrious words to the victim provoked the first blow and, thus, Henry Frazier's striking appellant was justified. Section 13-1-51, Code of Alabama, 1975, and the annotations.
As noted before, the evidence surrounding this incident is almost in total conflict. However, such evidence presented a question for the jury to determine. See Alabama Digest, Criminal Law, 747, for numerous cases on this principle of law.
A careful search of the record reflects no error injuriously affecting the substantial rights of the appellant. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur, except BOOKOUT, J., who concurs in the result.