[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 468 
The appellant was indicted in three separate two-count indictments for the child abuse of three infant sisters in violation of Ala. Code § 26-15-3 (1975). The cases were consolidated for trial. The jury found appellant guilty under count two of each indictment which charged her, in substance, as a responsible person, with torturing, willfully abusing, or otherwise willfully maltreating the infants by intentionally failing to provide them with proper nutrition of sufficient quality and quantity, so as to cause the infants to suffer from malnutrition, and as a result suffer serious physical injuries. The trial court fixed appellant's punishment at two years in the state penitentiary for each guilty verdict, each term to run consecutively.
Ms. Betty Jean Burks, the mother of the three infant girls in question, testified that on January 18, 1979, because of her mental and nervous condition, and on the advice of her psychiatrist at the Smolian Clinic in Birmingham, she turned custody of the children over to the Department of Pensions and Security (DPS). DPS subsequently placed the three girls in appellant's foster home where they remained until December 18, 1979. Ms. Burks testified that her daughters were in "perfect condition" and were not suffering from any illness when she gave temporary custody to DPS. (R. 20) While the little girls were staying in appellant's foster home, Ms. Burks saw them approximately four times and noticed on these occasions that they were physically ill. Ms. Burks stated that on the occasions she saw her little girls, the twins, who were five years' old, complained about the treatment they were receiving in appellant's home. They complained about being hungry and about being beaten. DPS was always responsible for arranging the children's visits with Ms. Burks. Ms. Burks had no personal contact with appellant.
During Easter weekend of 1979 Ms. Burks described all three of her daughters as being in "bad condition" and as having lost "a lot of weight." (R. 21) Ms. Burks stated that the girls appeared very hungry; "I mean they ate a lot." (R. 22) Ms. Burks testified that she made peanut butter and jelly sandwiches, cracker and jelly sandwiches, bologna sandwiches, boiled hot dogs and fed the girls cereal "and it still wasn't enough." (R. 22) The girls then suffered from nausea and diarrhea. Ms. Burks reported her daughters' condition to DPS worker Chris Humphries. Ms. Burks stated that she made more than one complaint to DPS about her daughters' physical condition, but to her knowledge DPS took no action.
Ms. Burks testified that on her daughters' third visit, which occurred while she was still receiving treatment and was living at the UAB Transitional Home, their physical condition was worse. "They still ate a lot and vomited and then had diarrhea." (R. 23) Ms. Burks next saw the girls on December 18, 1979 and described their condition as "very poor." (R. 24) They had lost even more weight. Ms. Burks took her daughters to Children's Hospital in Birmingham the next day where they remained for approximately one month. Ms. Burks has retained custody of the girls since that time.
Dr. Frank Bryson Waldo, a third year resident pediatric physician at Children's *Page 469 
Hospital, testified that he, along with Dr. Wesley Vick, examined the Burks children on December 20, 1979. Dr. Waldo stated that all three children were very withdrawn and quiet for their ages. "[A]ll three children were extremely thin in their extremities, arms, legs; they had very protuberant, large, abdomens; they had marked loss of the subcutaneous or fat just underneath the skin, all this indicating an acute lack of nutrition, basically of calories." (R. 58) Dr. Waldo also identified various scars on the girls which were "most consistent with being struck with a long, thin object."
When Dr. Waldo compared the three basic measurements used in pediatrics to assess the growth of children, height, weight and head circumference, he found that "all three children had normal head circumferences; normal height, although on the lower side of normal; and grossly abnormally low weights.Significantly below normal." (Emphasis added) (R. 59, 60) The normal weight for the twins was between forty and forty-five pounds. One twin weighed thirty pounds and the other weighed twenty-six pounds at the time they were admitted to the hospital. The normal weight for the two year old infant was between twenty-five and thirty pounds. She weighed eighteen pounds and seven ounces on admission. Dr. Waldo found no medical disorder or disease other than malnutrition which could have been responsible for the children's condition. "I know of no other disease process, no organic disease that could mimic this." (R. 63)
Dr. Waldo stated that when the children were initially admitted to the hospital they were put on a regular diet, but that "it was clear after the first day that their intestines were not going to be able to tolerate that." (R. 62) The children were then given limited amounts of food and "as they began to gain weight in the hospital we were slowly able to increase their diet." (R. 62) Dr. Waldo testified that due to the children's extremely famished condition at the time they were admitted to the hospital, "they had been without any substantial amount of food" for "certainly more than two weeks. If they had received no solid intake at all, water alone, it would have had to be over two to three weeks." (R. 63)
Dr. Waldo further testified that all three children were discharged from Children's Hospital on January 11, 1980 after a total stay of twenty-two days. At the time of discharge each child had increased in weight approximately twenty-five percent. The larger twin weighed forty pounds, the smaller twin weighed thirty-four pounds thirteen ounces and the two year old child weighed twenty-five pounds two ounces.
At the conclusion of Dr. Waldo's direct examination the following exchange occurred:
 "Q Dr. Waldo have you in the past in working in the hospital and in medical school and so forth studied child abuse?
"A Yes, sir.
 "Q The symptoms or what you would look for in an abused child?
"A Yes.
 "Q Are there any courses taught on that in medical school?
"A Not specific courses in medical school.
 "Q What courses that you took in medical school would encompass that area?
 "A In your pediatric rotation there are several lectures devoted specifically to recognition and diagnosis of child abuse.
 "Q Have you observed yourself instances of child abuse in your work?
"A Yes, sir.
"Q Would that be at Children's?
"A Yes, sir.
 "Q Have you observed such cases many times or few times?
"A I have testified in two other —
 "MR. DINSMORE: I would object again, I think this might be a matter better taken outside the presence of the jury and I move to do so.
"THE COURT: Overruled.
"MR. DINSMORE: Exception.
"Q You have testified in court?
 "A I have testified in court on two other cases of abused children and have seen a large enough number in the hospital *Page 470 
that weren't directly under my care but were in the hospital that I couldn't really, less than fifty but more than fifteen, in that range.
 "THE COURT: Let me ask you is child abuse recognized as a specific field of pediatric medicine?
 "A I don't understand your question. It's not a recognized board certified speciality . . .
 "THE COURT: I understand that. But is it a branch of . . .
 "A There are physicians who have made that their primary interest in pediatrics. And they have studied it and written about it.
 "THE COURT: So it is a separate field from just the care . . .
 "A I think that the recognition and diagnosis of child abuse is the responsibility of every general pediatrician and pediatric training programs make it their obligation to train the general pediatrician to recognize and diagnose the abused child because of the high mortality of unrecognized child abuse. I think it is recognized as a diagnosis that the trained pediatrician should make.
"THE COURT: In those terms? Child abuse?
"A Yes, sir.
"Q In your opinion were these children abused?
"A Yes.
 "MR. DINSMORE: Your Honor again I object. I still don't think he's qualified. He said there is a certain area of pediatrics that is that of child abuse. He is not qualified. He acknowledged the existence of some training that some other people may have had but the district attorney has not qualified this witness as having that training.
"THE COURT: Overruled.
"MR. DINSMORE: We except.
"THE COURT: You may answer.
 "A I do believe in my training as a general pediatrician that these children had been abused.
"MR. DUNN: Thank you, sir. That's all." (R. 68-70)
On cross-examination, Dr. Waldo testified that the childrenwere malnourished longer than one month before their admissionto the hospital and could have been gradually malnourished fora year.
Dr. John Wesley Vick, III, a second year resident pediatric physician at Children's Hospital, testified that he worked with Dr. Waldo in treating the Burks children. He saw the children on daily basis and concurred with Dr. Waldo that when the children arrived at the hospital they were very emaciated and malnourished.
 "I feel very strongly that they received very poor nutrition over an extended period of time prior to their admission to the hospital. I think that is very clear. I think that some of the scars that were on them are suspicious. I think it is also very clear that when they came to the hospital they were very withdrawn. In fact little Princess would not even speak. This indicates to me that there was abuse." (R. 89, 90)
Dr. Barbara Randolph Johnson, a licensed clinical psychologist head of the Department of Pediatric Psychiatry at Children's Hospital, and a member of the hospital's child abuse detection team, saw the Burks children on several occasions while they were in the hospital. Dr. Johnson stated that she performed psychological evaluations on all three girls. She gave the children one objective test, the Peabody Picture Vocabulary Test used to determine intellectual ability; the remainder of her testing was subjectively based. In discussing her subjective testing of the children the following exchange occurred:
 "Q And what conclusion did you reach as a result of this subjective testing?
 "A I saw their behavior change pretty dramatically during their hospitalization when I first came into contact with the twins. All three I would have labeled them pretty significantly depressed; their affect or their general mood was very dull, black, kinda bland. They were, I guess the best description is kinda vacant. They would rarely smile; rarely *Page 471 
talk; just would stare at you. This changed over time and towards the latter part of their hospitalization I saw them improve pretty dramatically. Then the behavior that I saw that was sorta worrisome was kind of an indiscriminate affection-seeking; indiscriminate in the sense of it doesn't matter who you were; they would run up to different adults in the hallway and hold on and ask to be picked up; ask for people to buy them food.
"Q Ask people to buy them food?
"A Yes.
 "Q Do you have a judgment based on your association and examination of the girls as to what factors caused this indiscriminate affection-seeking?
 "A This one behavior in combination with some others that I saw in the children led to the diagnosis of an adjustment reaction stemming from depravation.
"Q Depravation of what?
 "A Of a number of things for them. For physical need and emotional as well. You oftentimes see this with kids who have been either abused and/or neglected, that there is an almost craving or starving for affection and the kids will go to anybody to try to find it.
"Q And you saw that in these children?
"A Yes.
"Q All three of them?
 "A Yes. Now the younger one, her method of showing that was not as pronounced, it didn't demonstrate itself until she was discharged. She was the one I was most concerned about because she remained the most depressed and the hardest one to reach in the hospital. She left the hospital really before she had regained speech.
"THE COURT: She didn't talk in the hospital?
 "A Very little. She talked to one nurse in the hospital. She never spoke to me.
 "Q Based on your contact with them and your examination of them do you have an opinion as to what would cause them to be in the state that they were in when they first came to you in that they were blank; passive; staring?
 "A Coming from an environment where they had been, their needs were not met; where they had been abused; where they had been neglected. I think what they were showing was comparable to sort of a what in an adult might be seen as either traumatic shock syndrome or depressive reaction. Children can be depressed as well. I think what we saw was the equivalent of depression stemming from those kind of environmental things." (R. 105-107)
Dr. Johnson continued in her testimony that she had seen numerous cases of child abuse where the children exhibited a depressive reaction. In the Burks girls' case improvement began to occur within a week to ten days. Dr. Johnson testified over objection that the children had complained about being deprived of food, beaten and eating out of garbage cans; the trial court instructed the jury concerning this testimony as follows:
 "This does not mean that if that did, that that happened. This goes to the doctor's diagnosis of a certain fact. The fact that certain complaints were made is not evidence that they did in fact happen. They may not have happened. Certainly, ladies and gentlemen, you are not to take these last couple of questions to assume from this, this testimony, that that in fact happened and I instruct you not to consider that it is in fact true. But you may answer the question. And it goes just to the question as a history of this doctor to form a basis of a diagnosis; not the truthfulness of the complaints." (R. 108-109)
Ms. Chris Humphries, a DPS social worker whose duties included the supervision of children in foster homes, testified that she was familiar with the appellant and supervised her foster home in 1979. Ms. Humphries stated that the Burks children were first placed in appellant's foster home in January, 1979 and that she started working with the case in February. She stated that the Burks children remained under her supervision until they were removed from appellant's *Page 472 
foster home on December 19, 1979. During the course of the year Ms. Humphries testified that she made approximately eight visits to the appellant's home regarding the Burks children. Ms. Humphries arranged seven visits with the Burks children to see their mother. She personally transferred the girls from appellant's home to Ms. Burks. Ms. Burks was at no time allowed to visit the children at appellant's home.
At the conclusion of Ms. Humphries' testimony the State rested its case and the appellant's motion to exclude the evidence was overruled. Several defense witnesses, including the appellant who testified in her own behalf, presented evidence which was conflicting with the State's case. Appellant testified, in essence, that when she received the Burks children they were undernourished; that she fed them as much as she could, but they would not gain weight. Appellant admitted receiving $135.00 per child per month for their support from DPS.
 I
The State's evidence was sufficient to prove beyond any reasonable doubt that appellant was guilty of child abuse as charged in Count Two of the indictment. Any conflicting evidence was for the jury to resolve. McBryar v. State,368 So.2d 568 (Ala.Cr.App.), cert. denied, 368 So.2d 575 (Ala. 1979). This court is required to view the evidence in the light most favorable to the State. Bass v. State, 55 Ala. App. 88,313 So.2d 208 (1975), and not substitute its judgment for that of the jury. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). Where the evidence presented raises questions of fact for the jury, and such evidence, if believed, is sufficient to sustain conviction, the denial of a motion to exclude the State's evidence, the refusal to give the affirmative charge and the overruling of a motion for new trial, does not constitute error. Young v. State,283 Ala. 676, 220 So.2d 843 (1969).
Circumstantial evidence is not inferior evidence. Thomas v.State, 363 So.2d 1020 (Ala.Cr.App. 1978), and will support a conviction as strongly as direct evidence provided it points to the guilt of the accused. Kelsoe v. State, 356 So.2d 735
(Ala.Cr.App. 1978). The jury is under a duty to draw whatever permissible inferences it may from circumstantial evidence and to base its verdict on whatever permissible inferences it chooses to draw. Kontos v. State, 363 So.2d 1025, 1034
(Ala.Cr.App. 1978). See also Dolvin v. State, 391 So.2d 133
(Ala. 1980); Hayes v. State, 395 So.2d 127 (Ala.Cr.App. 1980), cert. denied, 395 So.2d 150 (Ala. 1981).
 II
Appellant contends that Dr. Waldo was not qualified as an expert witness to give testimony on the subject of child abuse. We disagree with this argument. From that portion of Dr. Waldo's testimony taken verbatim from the record, as previously set out in this opinion, it is clear that Dr. Waldo was properly qualified to give his expert opinions on the subject of child abuse.
The question of whether or not a particular witness will be allowed to testify as an expert is largely discretionary with the trial court, whose decision will not be disturbed on appeal except for palpable abuse. Kozlowski v. State, 248 Ala. 304,27 So.2d 818 (1946); Davis v. State, 352 So.2d 3 (Ala.Cr.App.), cert. denied, 352 So.2d 8 (Ala. 1977). An individual may qualify as an expert witness by study, practice, experience or observation. Radney v. State, 342 So.2d 942 (Ala.Cr.App.), cert. denied, 342 So.2d 947 (Ala. 1977). An expert witness is one who can enlighten a jury more than the average man in the street. Carlton v. State, 342 So.2d 1382 (Ala.Cr.App. 1977). Also see C. Gamble, McElroy's Alabama Evidence § 127.01 (5) (3rd.Ed. 1977).
 III
The trial court properly allowed Dr. Johnson to testify that in her examination and treatment of the Burks children, they complained of being deprived of food, being beaten and eating out of garbage cans. As *Page 473 
is stated in C. Gamble, McElroy's Alabama Evidence § 110.01 (1) (3rd.Ed. 1977):
 "The expert opinion testimony of a physician-witness as to the condition, diagnosis, prognosis or otherwise of his patient, whom he has personally examined, may be based in part on the history of the case, including both his present and past condition and symptoms as related by the patient to the physician-witness in connection with, and as part of, the examination. The physician, for the purpose of showing the basis of his opinion, may testify to the patient's statements to him concerning the history of the case."
See State Realty Company v. Ligon, 218 Ala. 541, 119 So. 672
(1929); Frazier v. State, 366 So.2d 360 (Ala.Cr.App. 1978).
Here, there was no admission through Dr. Johnson's testimony of any statements by the Burks children of past facts relating who was responsible for their condition or as to the cause or the way in which their condition occurred. C. Gamble, McElroy'sAlabama Evidence § 110.01 (2) (3rd.Ed. 1977). Appellant's name was not mentioned. Frazier, 366 So.2d, at 366 and authority cited therein. Moreover, the trial court's admonition to the jury concerning the reception of this evidence made it clear for what purpose the evidence was being received.
 IV
Appellant alleges that the trial court committed reversible error in sustaining the State's objection to the admission of Ms. Betty Jean Burks' Eastside Mental Health Center records, Defendant's Exhibit No. 20. Appellant alleges that the trial court's ruling was in violation of Ala. Code § 12-21-43 (1975). We disagree.
Appellant attempted to introduce these records during the testimony of Ms. Boni Ramken, the records technician of Eastside Mental Health Center. Ms. Ramken testified that the records were made by a Ms. Sharon Turner, "the therapist in charge" at the center. (R. 178) Ms. Burks was called to the witness stand on three different occasions during the course of appellant's trial. Through defense counsel's thorough and sifting cross-examination of Ms. Burks it was ascertained that on January 18, 1979, the day temporary custody of the three children was turned over to DPS, she was receiving treatment from the Smolian Clinic in Birmingham. As of that date Ms. Burks had been receiving treatment from the Smolian Clinic for "many months." (R. 39) She had taken her youngest daughter with her to the clinic on each of those visits, before the time she placed the children in DPS custody. It was only prior to her treatment at the Smolian Clinic that Ms. Burks had sought emotional and psychological help at the Eastside Mental Health Center. (R. 39, 40) Ms. Burks candidly admitted that she had gone to the Eastside Mental Health Center for approximately one year on a monthly basis and had discussed her psychiatric problems with counselors there. Throughout her testimony Ms. Burks gave frank and detailed accounts of her prior mental condition and of the treatment she received.
Any evidence of Ms. Burks' mental condition which was contained in her Eastside Mental Health Clinic records, however, does not appear to be in any way determinative of the issue of appellant's guilt. Ms. Burks had no contact with appellant. The question which the jury had to resolve was whether appellant was guilty of child abuse. Despite appellant's protestations that the children were not in good condition when she received them, they were definitely in very poor condition when her custody of them ceased eleven months later. The children's condition also vastly improved after they were properly nourished in the hospital for twenty-two days following the termination of appellant's custody.
We thus find that the refusal of the trial court to admit Ms. Burks' Eastside Mental Health Clinic records, which were compiled some months before appellant received custody of the three children, was proper. The admission of such evidence would have been remote, irrelevant and cumulative and would have tended to cloud the issues the jury was required to resolve. *Page 474 
The business entries exception to the hearsay evidence rule, Ala. Code § 12-21-43 (1975), cannot be used as a carte blanche vehicle to admit that which would otherwise be inadmissible.Greathouse v. Credit Bureau, Inc., 279 Ala. 524, 187 So.2d 565
(1966); Mahone v. Birmingham Elec. Co., 201 Ala. 132,73 So.2d 378 (1954). At most, the failure to receive Defendant's Exhibit No. 20 into evidence was harmless error. ARAP, Rule 45.
 V
State rebuttal witness Teresa Boggan, the DPS social worker who actually placed the Burks children in appellant's foster home in January, 1979, testified, without objection, that prior to the girls' placement in appellant's home she "judged them to be in excellent health." (R. 327) Mrs. Boggan stated that none of the girls appeared to be underweight from her personal observation.
Appellant then objected to the introduction of certain medical records pertaining to the twins, State's Exhibits No. 21 and 22. Mrs. Boggan stated that these medical records were included as part of their DPS records. The records indicated that the twins weighed 38 1/4 pounds and 31 1/2 pounds, respectively, on November 6, 1978. The records were received by the circuit clerk's office under subpoena duces tecum. While Mrs. Boggan testified that she did not know the exact date DPS received the twins' medical records, DPS kept medical records in every case. Mrs. Boggan believed that Ms. Chris Humphries was responsible for placing the children's medical records in the DPS records. Mrs. Boggan stated that a physical examination was required for every case coming under DPS.
Mrs. Boggan concluded her direct-examination that she saw the girls during the same month their weight information was recorded in State's Exhibits 21 and 22. She stated that the information recorded in those exhibits did not appear to be out of line with her weight perception of the girls from personal observation.
State's Exhibits 21 and 22 were not received into evidence as hospital records under Ala. Code § 12-21-5 (1975); rather they were received as business records under Ala. Code § 12-21-43
(1975). Whether or not these exhibits were properly received as business records, in conformity with Section 12-21-43, we need not decide because the entries pertaining to the twins' weight was cumulative of other evidence that the children were in good physical condition and were not underweight at the time they were taken to appellant's foster home. As is stated in Rule 45, ARAP:
 "No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of . . . the improper admission or rejection of evidence . . . unless in the opinion of the court to which appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties." (Emphasis added.)
 VI
There was no error in the trial court's failure to give appellant's requested jury charges. This court is not required to review the merits of requested charges when the accused does not reserve any exceptions to the trial court's refusal at the trial court level. Allen v. State, [November 24, 1981], App., (Ala.Cr.App. 1981). The "automatic exception" rule in criminal cases is no longer the law in Alabama. Allen, supra.
Moreover, we are of the opinion that the refused charges are either fairly and substantially covered by the oral charge of the trial court, or are abstract, misleading, not properly predicated on the evidence in this cause or are incorrect statements of the applicable legal principles, here controlling. The other refused charges are affirmative in nature and therefore properly refused under the evidence in this cause. Section 12-16-13, Code of Alabama 1975.
We have examined each issue raised by appellant. In addition, we have searched the record for errors prejudicial to appellant's *Page 475 
substantial rights and have found none. The circuit court's judgment of conviction is, therefore, due to be affirmed.
AFFIRMED.
All the Judges concur.