989 So.2d 1111 (2008)
M.R.D.
v.
T.D.
2060375.
Court of Civil Appeals of Alabama.
January 25, 2008.
Certiorari Denied March 14, 2008 Alabama Supreme Court 1070682.
*1112 Bruce N. Adams of Rice & Adams, PC, Anniston, for appellant.
Chad Lee, Wedowee, for appellee.
PER CURIAM.
M.R.D. ("the father") appeals from a judgment entered by the Randolph Circuit Court to the extent that it terminated his visitation with his minor child. We reverse and remand.
On June 3, 2004, the trial court entered a judgment divorcing the father and T.D. ("the mother"). The judgment declared that the parties would share joint legal custody of the minor child born of the marriage on April 30, 2001, but that the mother would have sole physical custody of the child with the father receiving specified visitation rights.
On April 22, 2005, the father filed a petition for modification of custody and a motion for contempt, alleging that the mother had violated the terms of the divorce judgment by denying him his visitation rights.[1] The father requested that the court award him primary physical custody of the child and that the court hold the mother in contempt for her failure to allow him to exercise his court-ordered visitation. On May 9, 2005, the mother filed an answer to the father's petition for modification and his motion for contempt; she also filed a motion to terminate the father's visitation. In support of her motion to terminate visitation, the mother alleged the following:
"1) The minor child has returned home from visitation with his father with a black eye and a busted nose.
"2) The [father] is verbally abusive to the child.
"3) The [father] does not spend time with the child during visitation.
"4) The [father] has violated this Court's order by consuming alcohol in the presence of the child.
"5) The [father] has exposed the child to things that he should not be exposed to which cause the child to be upset, confused, etc.
"6) The child cries because he does not want to go to visit with [the] father."
Subsequently, the child was interviewed by various counselors and psychiatrists. Based on the content of one of those interviews, the mother claimed that the father had sexually abused the child. The father has consistently and adamantly denied that he committed any sexual abuse.
On September 25, 2006, and October 25, 2006, the trial court held ore tenus hearings *1113 on the petition to modify and on the motion to terminate visitation. On November 27, 2006, the court entered a judgment denying the father's petition to modify and granting the mother's motion to terminate visitation. The court also denied all other pending motions or petitions, which included the motion to hold the mother in contempt for denying the father visitation. In its order, the trial court found that "there is ample evidence that there is a probability that the sexual abuse did occur." Accordingly, the trial court ordered that "[the father's] visitation with [the] child be and is hereby terminated and that [the father] shall have no contact whatsoever with [the child]."
On December 27, 2006, the father filed a motion to alter, amend, or vacate the judgment. On December 29, 2006, the court denied the father's postjudgment motion. The father timely appealed to this court on February 1, 2007. The father asserts three issues on appeal: (1) whether the trial court's decision amounts to an action outside that court's discretion in light of the evidence adduced; (2) whether, as a matter of law, a judgment denying all visitation between a noncustodial parent and a child must be supported by clear and convincing evidence; and (3) whether the trial court erred in allowing results of a polygraph test into evidence over the father's objection.
We first address the father's contention that the trial court erred in considering the results of a polygraph test administered by an investigator for the Calhoun County sheriff's office and admitted as part of the business records of the Randolph County Department of Human Resources. Ordinarily, the results of a polygraph examination are not admissible because "the reliability of polygraph examinations have not been sufficiently established." Smith v. State, 698 So.2d 189, 211 (Ala.Crim.App.1996). However, based on the record in this case, we conclude that the father failed to properly object to the introduction of the polygraph examination and its results.
Before the commencement of the trial, the father's attorney moved the court to remove any reference to the polygraph examination from the record. At that time, the trial court denied that motion on the basis that the results of the examination were contained in business records.[2] The father's attorney did not request an order from the trial court that further objection to the admissibility of the polygraph records would not be necessary. When the mother's attorney introduced the business records containing the polygraph results into evidence, the father's attorney did not object to the admissibility of the results of the polygraph examination even after the trial court pointed out that it considered the parties to have stipulated to the admissibility of all the business records. The father's attorney even questioned the witness from the Randolph County Department of Human Resources about the reliability of the polygraph examination.
We consider the father's motion to exclude any reference to the polygraph examination to be a motion in limine. The prevailing rule in Alabama is that
"an appellant who suffers an adverse ruling on a motion to exclude evidence (or other matters, e.g., argument of counsel), made in limine, preserves this adverse ruling for post-judgment and *1114 appellate review only if he objects to the introduction of the proffered evidence or other matters and assigns specific grounds therefor at the time of trial, unless he has obtained express acquiescence of the trial judge that such subsequent objection to evidence proffered at trial and assignment of grounds therefor are not necessary."
Liberty Nat'l Life Ins. Co. v. Beasley, 466 So.2d 935, 936 (Ala.1985). Because the father did not state any objection to the admissibility of the polygraph records at the time they were offered into evidence, he has waived any argument that the trial court erred in considering those records. See Bolden v. State, 568 So.2d 841 (Ala. Crim.App.1989).
We next consider the correctness of the trial court's decision regarding visitation. The general principle of review to which this court is firmly committed is that a determination of a child's visitation with a noncustodial parent is a matter within the trial court's discretion. We will not alter such a determination unless the trial court's decision is unsupported by the evidence so as to fall outside of the trial court's discretion and to be contrary to the best interests of the child. Evans v. Evans, 668 So.2d 789, 789-90 (Ala.Civ.App. 1995).
However, Alabama statutes and caselaw clearly espouse a policy favoring continued contact between children and noncustodial parents following a divorce. See Carr v. Broyles, 652 So.2d 299, 304 (Ala.Civ.App. 1994) ("A noncustodial parent should be given the opportunity to maintain a meaningful relationship with her child."); Naylor v. Oden, 415 So.2d 1118, 1120 (Ala.Civ. App.1982) (when a parent is fit, he or she "should have reasonable rights of visitation"); and Ala.Code 1975, § 30-3-150 ("It is the policy of this state to assure that minor children have frequent and continuing contact with parents who have shown the ability to act in the best interest of their children"); see also Ala.Code 1975, § 30-3-160 (the Alabama Parent-Child Relationship Protection Act reflects philosophy that "children need both parents, even after a divorce").
We do not believe that a termination of visitation mandates application of a clear-and-convincing evidentiary standard, as the father asserts. In light of the strong public policy favoring visitation, however, in cases where a final judgment (as opposed to a pendente lite order) indefinitely divesting a parent of all visitation rights is entered, that judgment should be based on evidence that would lead the trial court to be reasonably certain that the termination of visitation is essential to protect the child's best interests. Thus, notwithstanding the discretionary role of our learned trial judges, this court will continue to carefully scrutinize judgments divesting parents of all visitation rights with their children. See In re Norwood, 445 So.2d 301, 303 (Ala.Civ.App.1984) (reversing judgment denying all visitation to child's mother); Naylor, 415 So.2d at 1120 (reversing judgment denying all visitation to child's mother and stating that "the rights of natural parents, in visitation disputes as much as custody disputes, should be treated with great deference"); V.C. v. C.T., 976 So.2d 465, 469 (Ala.Civ.App.2007) (main opinion indicating that "a total denial of visitation rights has been upheld only rarely").
In this case, the trial court based its judgment on what it termed "ample evidence" of a "probability" of sexual abuse. The record shows that the mother's May 9, 2005, motion to terminate visitation alleged, among other things, the following: (1) that the father was verbally abusive to the child; (2) that the father had exposed the child to things that he should not be *1115 exposed to, which, among other things, had purportedly caused the child to be upset and confused; and (3) that the child had cried because he did not want to go to visits with his father. Originally, the mother did not include any allegations of sexual abuse in her request to terminate the father's visitation rights. However, after the mother took the child to a counselor, allegations arose that the child, who was then four years old, had been inappropriately and sexually touched by G.H., the five-year-old son of the father's girlfriend. On June 2, 2005, the trial court entered a pendente lite order allowing the father supervised visitation with the child but preventing anyone else from accompanying the father to visitation, including the father's girlfriend and her children. The order also required the parties to undergo counseling and to cooperate with any investigation by the Department of Human Resources ("DHR").
On June 22, 2005, the Child Advocacy Center ("CAC") conducted a recorded forensic interview with the child. According to a written summary of the interview, the child indicated that, in addition to G.H., the father had also inappropriately touched him and had played "games" with him that he did not want to play. Based on statements made by CAC personnel, the mother began claiming that the father had sexually abused the child. Although the father consistently denied having committed any sexual abuse, DHR, relying solely upon the CAC interview, determined that sexual abuse on the part of the father was "indicated." On December 21, 2005, the father was indicted for having had sexual contact with a minor female between the ages of 12 and 16, presumably based on the allegations of abuse stemming from the CAC interview (although the child is male and was a preschooler at the time). The indictment was later nol prossed, and no further efforts to reindict the father have been undertaken by prosecutors.
The video recording made of the CAC interview was introduced into evidence as an exhibit. The recording shows that the child, early in the interview, states that the father "does mean stuff and I don't like it" but does not react emotionally to the initiation of questioning regarding the father. In response to further questioning about such "mean stuff," the child states that the father routinely failed to take him horseback riding after having offered to do so and that the father drinks beer. The child then states that although G.H. plays "private games" with the child, such as "sticking hands on my privates" in G.H.'s bedroom, the father "never plays with me." When initially redirected to the issue of whether the father does anything bad besides drink beer, the child responds "no." After approximately 25 minutes of questioning, the interviewer informs the child that she will leave the room to ask another person if there will be any more questions, indicating that the interview will conclude soon.
However, when the interviewer returns to the room approximately one minute later, she subjects the then four-year-old child to further examination based upon a questionable initial premise:
"[The interviewer]: Earlier you told you told me that Daddy makes you play games that you don't want to play. What kinds of games are those?

"[The child]: Private games.
"[The interviewer]: Private games? What kinds of private games does Daddy make you play?
"[The child]: Um ... the kind that [G.H.] plays.
"....

*1116 "[The interviewer]: Will you tell me about the private games that you and Daddy play?
"[The child]: Um, the kind that's mean.
"[The interviewer]: The kind that's mean?
"[The child]: Yeah.
"[The interviewer]: Like ... how is it mean?
"[The child]: He ... he, um ... he, um.. he's just mean and I don't want to go see him anymore. When I go, he just, he's just so mean.
"[The interviewer]: He's just so mean? Well, I, I really need to try to find out about the games that you and Dad play. What do you and Dad do during those private games?
"[The child]: Um, uh, they're different stuff.
"[The interviewer]: Can you tell me what that stuff is? Tell me what the different stuff is.
"[The child]: Hehe's so mean.
"[The interviewer]: Does Daddy do anything like what [G.H.] does?
"[The child]: Yeah.
"[The interviewer]: What does Daddy do?
"[The child]: He is mean and I don't like him."
(Emphasis added.)
The resumed interview then devolves for approximately 30 seconds into play, after which the interviewer shows the child a diagram of the human body and directs the child to "put an X on the part of your body that Daddy plays in the private game," and the child marks the sex organ indicated on the diagram. The child then is asked whether the father has touched him with or without clothes on and about the location where touching occurs; the child responds that the touching occurred while he was clothed and in the father's bedroom. However, by this point of the interview, the child has begun fidgeting with his face, banging folded paper pieces on a table, and wandering from the interview table around the room.
Whether the child's statements made during the interview could properly be considered evidence of abuse on the part of the father was a matter in sharp conflict in the trial court. Dr. Ingrid Vasiliu-Feltes, an attending psychiatrist at an Anniston hospital who undertook forensic evaluations of the parties and the child, testified by deposition that, after her initial contacts with the parties and the child, she had recommended that supervised visitation be allowed between the father and the child. According to Dr. Vasiliu-Feltes's assessment of the parties, the father did not reflect any personality disorders, but the mother appeared to have a personality style that tended to exaggeration, distortion, and anxiety that might have influenced the child. Dr. Vasiliu-Feltes later reviewed the video recording made of the CAC interview and altered her opinion considerably. Although she testified in her deposition that the father's profile did not fit the profile of an abusive parent, and despite having suspicions concerning the timing of the abuse allegations from the mother, Dr. Vasiliu-Feltes opined in late September 2005 that the CAC interview "met all standards" and that "it would seem in the best interest of the child to stop all contact with [the father]." However, at her deposition, Dr. Vasiliu-Feltes clarified that her recommendation was not that visitation be terminated permanently, but rather that the father and child be reevaluated after six months or a year with an eye to restoring contact.
Dr. David Wilson, a clinical psychologist who specializes in child-sexual-abuse matters, testified at trial that he had extensive field experience, having undertaken hundreds (if not thousands) of abuse evaluations *1117 and having served on the board of directors of a child-advocacy center in Gadsden. Based upon his review of the video recording of the CAC interview, Dr. Wilson opined that the interview "was in no way definitive that [the father] did anything sexually to th[e] child" because, among other things, the child had revealed the potential abuse only after repeated questioning and only after making several statements that the father was "mean" (which, Dr. Wilson opined, raised "red flags" about parental alienation). Dr. Wilson specifically noted the child's initial denial in the interview that the father (as opposed to G.H.) had played "private games" with the child and that the interviewer had continued to ask questions about the father's behavior towards the child despite that denial:
"And again, [the child] mentioned [G.H.], but not his father, at this point. So, I'm not sure why [the interviewer] keeps bringing up dad. My concern is she had asked so many times, he may have finally gotten the hint or the suggestion that he needed to say something about dad, because she kept asking about him. And again, my experience, kids will pick up on that, and you keep asking them, asking them, and asking them, they're going to come up with something."
Dr. Wilson ultimately concluded that, based solely upon the interview, "there is nothing I could see ... where anybody could make a definitive conclusion or opinion about th[e] father"; he strongly disagreed with Dr. Vasiliu-Feltes's conclusions regarding the value of further delay in allowing visitation between the father and the child.
At the conclusion of the trial, addressing both counsel for the mother and counsel for the father, the trial court stated: "I'm going to let both of you brief this case for me and prepare orders the way you think it ought to be." The judgment form executed by the trial court is the one prepared by the mother, which, not surprisingly, incorporates her position that all visitation between the father and the child should be terminated. In its judgment, the trial court specifically acknowledged the likelihood that supervised visitation would protect the child's physical safety, but it opined that "there is no way to insure that the child will not be mentally, psychologically, and emotionally injured if he has contact with [the] father." The trial court labeled as "undisputed" testimony to the effect that "the child reacts, to the extent of wetting his pants and vomiting, when he fears contact with [the] father." However, that determination overlooked evidence in the record indicating that, in an interview with a psychiatrist in practice with Dr. Vasiliu-Feltes, the child had stated that he loved the father and wanted to see him; moreover, when reunited with the father during an evaluation session with Dr. Vasiliu-Feltes, the child did not reject the father's presence and did not lose bladder control despite experiencing some anxiety. The latter fact tends to demonstrate that supervised visitation with the father, even in the short term, would not, in fact, traumatize the child.
Although the expert evidence was in conflict concerning whether the alleged abuse actually occurred, it is notable that neither expert gave testimony tending to support the proposition that the father's visitation with the child should be terminated indefinitely, as the mother advocated and as the trial court ordered. Dr. Wilson opined that the father and the child should immediately resume visitation. For her part, Dr. Vasiliu-Feltes opined at her January 2006 deposition that the issue of visitation between the father and the child could be reevaluated within the following year at the latest. We note that, as of the date of this decision, the father has had no contact with the child for more than two and one-half years.
*1118 Visitation is a matter entrusted to the discretion of our learned trial judges. However, that discretion is not unbridled, and it should be exercised with a view towards the policy of preserving relationships between parents and children whenever possible. We reiterate that a final judgment that ends all visitation between a parent and a child should be based upon evidence that would lead the trial court to be reasonably certain that the termination of visitation is essential to protect the child's best interests. Here, the trial court acted to indefinitely terminate all visitation with the child by the father, both supervised and unsupervised, based upon a single item of primary evidence: the video recording of the CAC interview. The trial court found only "ample evidence that there is a probability that the sexual abuse did occur." We conclude that, based on the unique and specific circumstances of this case, the trial court's decision was overly restrictive and was not supported by the appropriate quantum of evidence.
Based upon the foregoing, the judgment of the Randolph Circuit Court is reversed. The cause is remanded for the trial court to set an appropriate visitation schedule and to exercise its discretion to determine appropriate conditions under which that visitation should be exercised, to include conditions respecting the timing of visitation and supervision of the father's visitation by laypersons or experts.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, BRYAN and MOORE, JJ., concur.
THOMAS, J., concurs in the result, without writing.
NOTES
[1] In later filings, the father specifically alleged that the mother had begun denying him visitation approximately two months before the father initiated this action.
[2] The trial court erred in this reasoning. The fact that the polygraph results were part of a compilation of business records merely allows them to fall within an exception to the hearsay rule; it does not guarantee blanket admissibility. See Rule 803(6), Ala. R. Evid; and Gullatt v. State, 409 So.2d 466 (Ala.Crim.App. 1981).