439 So.2d 727 (1983)
Gayle Weaver PHELPS
v.
STATE.
3 Div. 497.
Court of Criminal Appeals of Alabama.
May 31, 1983.
Rehearing Denied July 5, 1983.
Certiorari Denied October 28, 1983.
*729 Calvin M. Whitesell, Roger S. Morrow, and Wesley Romine, Montgomery, for appellant.
Charles A. Graddick, Atty. Gen., and Helen P. Nelson, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 82-988.
*730 SAM W. TAYLOR, Judge.
Following the death of her twenty-month-old son, appellant was indicted and convicted for child abuse stemming from her failure to prevent harm to the boy by his stepfather, appellant's husband. The stepfather's conviction for murder was affirmed by this Court in Phelps v. State, 435 So.2d 158 (Ala.Cr.App.1983). Appellant was sentenced to five years' imprisonment.
The State's evidence established that on August 24, 1981, David Phelps caused the death of James Allen (Jamie) Weaver, Jr. by striking him in the abdomen. Dr. Thomas P. Gilchrist, forensic pathologist who performed an autopsy on the child, testified that the boy died as a result of a lacerated stomach, pancreas and mesentery which allowed the escape of air and blood into the abdominal cavity. Gilchrist gave his opinion that the injuries had been caused by a blow of "tremendous force" to the abdomen. The pathologist also noted the presence of numerous bruises on the child's body, specifically on the chest, abdomen, head, face, back, buttocks and groin areas. He stated that, in his judgment, the bruises were two to five days old, while the fatal blow had been administered only hours prior to the child's death.
Mrs. Joy Bozeman testified that she provided daycare for appellant's children, Jamie and Kristie, in her Autauga County home from February to May of 1980, and from September 1980 to February 1981. In February of 1981, Mrs. Bozeman observed a severe burn on Jamie's ear, and she questioned appellant about how the injury occurred. At first appellant told her that Kristie had burned Jamie's ear, but later she said that her husband David had accidentally burned the child's ear with a hair dryer.
During the same period of time, Mrs. Bozeman also noticed a burn on Jamie's back, which appellant explained by saying the boy had backed into her cigarette lighter, and a bump on the child's head which appellant said had happened when Jamie fell down the steps. Mrs. Bozeman noted that, unlike other mothers who brought their children for daycare, appellant never pointed out Jamie's injuries before being asked about them. When Mrs. Bozeman mentioned that Jamie was having "too many injuries" appellant replied that he was "just accident prone."
Mari Lynn Fredrickson Doyle lived near appellant and David Phelps in Autauga County from January to the summer of 1980, and often babysat for appellant's two children. She stated that appellant and David Phelps were married in April of 1981, although Phelps had been living with appellant since January of that year. The witness testified that she often noticed unusual bruises and burns on Jamie, and she specifically recalled the child's burned ear. When Ms. Doyle asked appellant about the boy's ear, appellant first stated that her husband David had inadvertently burned it with a blow dryer, but she later admitted to Ms. Doyle that David "held Jamie down on the bed and waited for the skin to bubble."
On another occasion, appellant called Ms. Doyle at work and requested that she come to appellant's trailer to babysit. When the witness arrived, she saw David Phelps' things packed and she thought he was leaving. Phelps told Ms. Doyle, in appellant's presence, that he had hit Jamie without realizing how hard he was striking him. Ms. Doyle saw Jamie and observed that his back was badly bruised all over. Appellant told Ms. Doyle to keep a shirt on Jamie and not to let anyone see the bruises.
Ms. Doyle also recounted that she witnessed David Phelps hold Jamie down or pry open the boy's mouth, with appellant present, and blow marijuana smoke in the child's face. The witness said that "whenever a marijuana cigarette would be lit [Jamie] would start crying and run into another room." Once Ms. Doyle saw David strike Jamie so hard the child "went across the kitchen." When the babysitter mentioned the incident to appellant, appellant said not to worry about it. Ms. Doyle also told appellant that David said he did not like Jamie because the boy looked too much like his natural father, appellant's first husband.
*731 Ms. Doyle testified that after witnessing numerous incidents of abuse, she informed appellant "that she needed to get away from David, that he wasn't right for her or the kids and that he was going to end up really hurting one of them." According to the witness, appellant replied that she loved and wanted David and "things would be okay later."
Lisa Hyde, the sister of David Phelps, testified that she kept Jamie at her mother's Montgomery home the Friday night before his death on Monday. At that time she noticed several small round bruises on Jamie's stomach and back. She questioned her brother about the bruises and he said he did not know how they had occurred. Approximately three weeks earlier, Ms. Hyde saw a large, red handprint on Jamie's back and called it to appellant's attention. Appellant stated that she had not seen it, that she knew nothing about it. Several days later, according to Ms. Hyde, the handprint was still there but it was turning blue.
Sue Ann Weaver, Jamie's grandmother, testified that appellant was formerly married to her son. She last saw Jamie about three weeks before he died. At that time she observed a large bruise covering the side of his head and ear.
At the conclusion of the State's case, the defense attorney moved to exclude the evidence on the grounds that the State had not presented a prima facie case and, specifically, had not proved venue in Montgomery County. The motion was overruled and the defense presented numerous friends and co-workers of appellant who testified, in substance, that they had never observed unusual bruises, marks or burns on Jamie, that appellant was a good mother, and that her general reputation was good.
The appellant testified in her own behalf that she married David Phelps on April 6, 1981, but that he was at her trailer "all the time" in the four months preceeding that date. She said that she was either not present or had no knowledge of the infliction of the various injuries on her son Jamie as related by witnesses for the State. On the two occasions when she was aware of abuse to the boyonce when Phelps hit him on the back and once when he blew marijuana smoke in the child's faceshe testified that she and Phelps had a big argument about his treatment of Jamie.
Appellant denied that Mari Doyle had informed her of David's ill treatment of Jamie. She testified that David gave her an explanation of all Jamie's injuries but she acknowledged that her husband's explanations were contradictory at times. For example, he first told her Kristie had burned Jamie's ear with the hair dryer, but then he said he himself had done it accidentally.
Appellant stated that she and Phelps moved to Montgomery on July 10, 1981. About a week before Jamie died, her daughter Kristie complained that her leg hurt, saying that she fell in the sandbox at school. Appellant took Kristie to the hospital, the child was admitted, and appellant stayed with her daughter virtually the entire time she was hospitalized. During this period, appellant left Jamie with David Phelps. Appellant stated that because she spent all her time, during the last week of Jamie's life, in the hospital with Kristie she did not bathe or clothe Jamie and had no occasion to notice any bruises or injuries on him. When she did periodically come home from the hospital, Jamie was sleeping and she had very little contact with him.
Appellant acknowledged that Phelps had physically abused her and, immediately before they moved to Montgomery, Phelps had gotten into a violent argument with appellant's father, who lived next door to them in Autauga County. The altercation resulted in both Phelps and appellant's father having to be sewed up at the emergency room for wounds received in the fight. Appellant conceded that David Phelps had a violent temper and stated that prior to Kristie's hospitalization she had planned to take the children and leave but she "never got the opportunity."
On Monday August 24, 1981, David called her at work to tell her Jamie needed to see a doctor. She went home, called the paramedics, and gave the child mouth-to-mouth *732 resuscitation. Appellant noticed Jamie's bruises for the first time when the paramedics cut away the boy's pajamas.
After the defense rested, the State called paramedic Buddy Pitts, in rebuttal. Pitts said that when he and the other fire medics arrived on the scene Jamie Weaver was wearing only a diaper and had no clothing covering his legs or chest.

I
Appellant contends that the trial court erred by overruling her demurrer to the indictment because the charge against her failed to state an offense. The statute under which she was prosecuted, § 26-15-3, Code of Alabama 1975, provides that
"A responsible person, as defined in section 26-15-2, who shall torture, willfully abuse, cruelly beat or otherwise willfully maltreat any child under the age of 18 years shall, on conviction, be punished by imprisonment in the penitentiary for not less than one year nor more than 10 years." (Emphasis added)
Omitting the formal parts, the grand jury of Montgomery County charged that
"GAYLE WEAVER PHELPS, alias
GAYLE WEAVER, alias
GAYLE DANIELS,
"whose name is to the Grand Jury otherwise unknown, being the natural parent, legal guardian, custodian or a person with the permanent or temporary care or responsibility for the supervision of James Allen Weaver, Jr., a child under eighteen years of age, did torture, wilfully abuse, cruelly beat or otherwise maltreat said child, by to-wit: GAYLE WEAVER PHELPS, alias GAYLE WEAVER, alias GAYLE DANIELS, did voluntarily fail to remove the child James Allen Weaver, Jr., from the custody, care or control of David Wilson Phelps who had repeatedly subjected the child James Allen Weaver, Jr., to acts of beating or burning or kicking, said omission thereby worsening or aggravating the injuries or conditions which lead to the death of James Allen Weaver, Jr., in violation of Section 26-15-3 of the Code of Alabama, ..." (Emphasis added).
Citing Dates v. State, 335 So.2d 222 (Ala.Cr.App.), cert. denied, 335 So.2d 225 (Ala.1976), appellant maintains that the omission of the word "willfully" before the term "maltreat" in the accusation rendered the indictment fatally defective. Generally, of course, if a criminal statute makes a certain act an offense if it is done willfully, then willfulness is an essential element of the crime, and "in describing the offense it is necessary that the word `wilfully' should be used, or words equivalent in their meaning." Joyce on Indictments § 403 at 456 (A. Blakemore 2d ed. 1924) (emphasis added).
Unlike the indictment in Dates, however, which, by omitting the term "willfully" simply did not charge an offense or put the accused on notice that he was alleged to have committed any crime at all, the factual averments of the indictment in the present case spelled out precisely what offense was charged and put appellant on notice that her crime was one of "fail[ure] to remove the child James Allen Weaver, Jr., from the custody, care or control of David Wilson Phelps who had repeatedly subjected the child James Allen Weaver, Jr., to acts of beating or burning or kicking, said omission thereby worsening or aggravating the injuries or conditions which lead to the death of James Allen Weaver, Jr.,..."
In People v. Peckens, 153 N.Y. 576, 47 N.E. 883 (1897), the New York court held that under a statute requiring the indictment to contain "[a] plain and concise statement of the act constituting the crime, without unnecessary repetition," the defendant was not harmed when the indictment omitted the term "willfully" but alleged facts necessary to constitute the offense. The court observed the following:
"That the indictment in this case charged all the facts, instead of alleging a conclusion, constituted no sufficient objection to its validity. The defendant, being fully apprised of the particular acts for which *733 he was to be held responsible, had no just reason to complain."
47 N.E. at 885-86 (Construing N.Y. Code Crim.Proc. § 275 (1881)). Section 15-8-25, Code of Alabama 1975, is similar to § 275 of the New York Code of Criminal Procedure in that it also requires the indictment to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." See also Gayden v. State, 38 Ala.App. 39, 80 So.2d 495 (1954), aff'd, 262 Ala. 468, 80 So.2d 501 (1955).
More importantly, the factual averment here charged that appellant voluntarily engaged in the described conduct. In our judgment, the word "voluntarily" in this context is equivalent in meaning to the word "willfully" as found in the statute. The two terms have even been used interchangeably. "Willful" has been defined as "[p]roceeding from a conscious motion of the will; voluntary." Black's Law Dictionary 1773 (rev. 4th ed. 1968) (emphasis added). Likewise, the word "voluntary" has been determined to mean "[p]roceeding from the free and unrestrained will of the person." Black's Law Dictionary at 1746-47 (emphasis added). We therefore find that the word "voluntarily" as used in the indictment is substantially equivalent to the statutory term "willfully." "An accusation sufficiently charges a statutory offense if it follows the language of the statute substantially or uses equivalent words, if the accused is thereby fully informed of the particular statute on which the charge is based." Wharton's Criminal Procedure § 289 at 118, 120 (C. Torcia 12th ed. 1975).
In Rumely v. United States, 293 F. 532 (2d Cir.), cert. denied, 263 U.S. 713, 44 S.Ct. 38, 68 L.Ed. 520 (1923), the Court of Appeals noted the following:
"The general rule is that the term `wilfully' cannot be omitted from an indictment when the term is part of a statutory definition. But it has been held that, where the facts alleged necessarily import wilfulness, the failure to use the word `wilfully' is not fatal to the indictment."
293 F. at 547 (citations omitted). Similarly, against a challenge to an indictment omitting "willfully" from a charge that the accused knowingly and willfully caused false writings to be made, another federal court observed:
"Formal words are unnecessary where the allegations necessarily or fairly import guilty knowledge; words which import an exercise of the will may take the place of the word `willfully.'"

United States v. Okin, 154 F.Supp. 553, 555 (D.N.J.1955) (emphasis added and citations omitted).
It is our opinion that the language of the indictment here "necessarily import[ed] guilty knowledge" and that the term "voluntarily" substituted for the word "willfully." Any other construction would be contrary to good common sense. Moreover, in view of the detailed factual averments, there can be no serious claim that appellant was tried for an offense different from that intended by the grand jury, that she was unable to prepare her defense, or that the court was unable to pronounce judgment on the record. See Gayden v. State, supra. As the Kentucky court concluded in Toler v. Commonwealth, 94 Ky. 529, 23 S.W. 347 (Ct.App.1893):
"The word `wilfully' is omitted in the accusatory part of the indictment but, as to the mode of committing the offense, it is charged that the defendant wilfully... shot and wounded [the victim] with the intent to take his life; and to say that the offense is not stated with such certainty as to apprise the defendant of what he stands charged would be extremely technical and nullify a conviction warranted by both the indictment and the proof." 23 S.W. at 347.

II
Appellant also claims that the indictment was defective for failing to specify that she was charged with complicity, as defined in *734 § 13A-2-23, Code of Alabama 1975. That section provides, in pertinent part, that
"A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
....
"(3) Having a legal duty to prevent the commission of the offense, he fails to make an effort he is legally required to make."
Appellant insists that because she was tried for an omission to act, which she claims is not prohibited by the child abuse statute, she should have been put on notice by the indictment that her crime was one of complicity. We note, first, that the child abuse statute does encompass acts of omission as well as those of commission. See Gullatt v. State, 409 So.2d 466 (Ala.Cr.App. 1981) (failure to provide proper nutrition).
Second, although in our judgment the indictment did put appellant on notice that she was charged with a failure to remove the child from the abusive environment created by her husband, David Phelps, there is no requirement that an accused be charged with complicity in the indictment. Johnson v. State, 405 So.2d 149, 153 (Ala.Cr.App. 1981).
If the State relies on the theory of complicity, its proof must, of course, establish the elements of complicity, but it need not specify those elements in the indictment. Johnson v. State, supra.

III
Maintaining that the State's proof of venue and criminal intent were insufficient, appellant argues that her motion to exclude the evidence should have been granted.
Appellant correctly points out that for a prosecution based upon breach of her duty to prevent child abuse, venue was in the county where the duty was breached. Caylor v. State, 219 Ala. 12, 121 So. 12 (1929). She claims there was no evidence that she breached a duty in Montgomery County where she was tried, and that the breach occurred in Autauga County, if at all. Appellant states that there was "[no] evidence that she voluntarily failed to remove the child from the custody, care or control of her husband, David Phelps, during any period in which the couple resided in Montgomery County."
The foregoing contention is refuted by appellant's own trial testimony wherein she acknowledged that she had planned to take the children and leave Phelps but "never got the opportunity." In our judgment, the jury was authorized to conclude that appellant never made the opportunity. The jury had before it the fact that appellant left Autauga County, where her parents were located next door, and where, presumedly, they would have provided refuge for her and her children, and knowing well Phelps's violent propensities, she voluntarily moved to Montgomery with him.
Furthermore, there was proof (albeit contradicted by appellant's testimony) that Lisa Hyde saw evidence of abuse to Jamie in Montgomery County and reported it to appellant, thereby putting appellant on notice of her duty to protect the child in Montgomery County.
Moreover, section 15-2-6, Code of Alabama 1975, provides that "[w]here an offense is committed partly in one county and partly in another or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties, venue is in either county."
Even if all David Phelps's abuse of Jamie had taken place in Autauga County, appellant's duty to prevent that abuse was a continuing one and was not extinguished once the family moved to Montgomery. Thus, her failure to remove the child from Phelps's influence in Montgomery County, after being put on notice of his ill treatment in Autauga County, falls within the venue exception of section 15-2-6, supra. See Connell v. State, 39 Ala.App. 531, 105 So.2d 695 (1958).
Contrary to appellant's assertion, the testimony regarding acts of violence committed on Jamie in Autauga County *735 was properly admitted. It was admissible as part of a continuous pattern of ill-treatment which should have put appellant on notice of the need to prevent further abuse of her son. Under the circumstances, her duty to prevent harm to Jamie could not have arisen until she was alerted to her husband's behavior. The conduct of David Phelps toward Jamie, therefore, was relevant and admissible, regardless of where it occurred, because it had a bearing on appellant's knowledge of the abuse. Cf. Reddett v. Mosley, 45 Ala.App. 38, 222 So.2d 369 (1969) (evidence to prove owner had knowledge of animal's vicious propensities); Atkins v. State, 60 Ala. 45 (1877) (evidence to prove seller of alcoholic beverages knew intemperate habits of drinker).
Finally, the question of appellant's criminal intent was properly left to the jury to resolve. The evidence was in sharp dispute, with all the defense testimony pointing to the fact that appellant was unaware of her husband's ill treatment of her son. The testimony from State's witnesses Joy Bozeman and Mari Doyle, however, provided evidence which, if believed, would have authorized the jury to find that appellant knew of the abuse to her son and, having a duty to prevent it, did nothing to halt it. When there is legal evidence from which the factfinders can by fair inference find the accused guilty, this court will not disturb the verdict. Hughes v. State, 412 So.2d 296 (Ala.Cr.App.1982); Williams v. State, 335 So.2d 249 (Ala.Cr.App.1976).

IV
Appellant insists that the trial court's oral instruction regarding the complicity statute, § 13A-2-23, Code of Alabama 1975, was erroneous. This issue, however, has not been preserved for review, since defendant announced "satisfied" at the conclusion of the oral charge, see Tuck v. State, 384 So.2d 1240 (Ala.Cr.App.1980), and took no exception to the court's refusal of certain requested written charges, see Allen v. State, 414 So.2d 989 (Ala.Cr.App. 1981), affirmed, 414 So.2d 993 (Ala.1982).

V
Appellant maintains that her trial counsel was ineffective, due to his "failure to note a continuing objection to the venue of the trial" and due to his failure to object or except to certain portions of the court's oral charge.
As we have indicated in part III of this opinion, venue was proper in Montgomery County. In addition, although counsel did not object to the court's oral charge regarding complicity, we do not deem this omission to constitute inadequate representation.
An accused is not entitled to error-free counsel. Graham v. State, 403 So.2d 275 (Ala.Cr.App.1980), cert. quashed, 403 So.2d 286 (Ala.1981). In order to have a conviction reversed because of ineffective counsel, defendant must show that the lawyer's representation was merely perfunctory, and that the conduct of the attorney reduced the trial to a farce, sham or mockery of justice or shocked the conscience of the reviewing court. Bridges v. State, 391 So.2d 1086 (Ala.Cr.App.1980).
"[E]ven though it can be definitely shown that an attorney has made a mistake in the trial of a case that results in a judgment unfavorable to his client, this alone is not sufficient to demonstrate that his client has been deprived of his constitutional right to adequate and effective representation by counsel....
Lee v. State, 349 So.2d 134, 136 (Ala.Cr. App.1977).
A review of the entire record clearly indicates that appellant's trial was not reduced to a sham or mockery of justice. Trial counsel conducted a vigorous defense by cross-examining the State's witnesses and by calling some twenty-eight witnesses for the defense. Appellant herself expressed satisfaction with her trial attorney even after she had been convicted and had retained different counsel on appeal, as shown by the following "Notice of Withdrawal and Release of Counsel."
"COMES NOW, The Defendant Gayle Phelps and releases the Honorable Robert *736 M. Beno from any future responsibility in reference to the above styled cause. This release is not by way of dissatisfaction, but due to certain financial obligations and sureties I have retained separate counsel. The representation by Mr. Beno has been adequate and I am satisfied with the same.
"This release is with the understanding that the motion for a new trial must be filed no more than thirty days from judgment of November 21, 1981. Having stated my satisfaction with Mr. Beno as providing adequate representation; I hereby release him from all future responsibility in reference to this case in whatever form it may take."
We do not find that appellant's right to counsel has been abridged.

VI
Appellant argues that her motion for new trial should have been granted because prejudicial photographs of her dead son were introduced at trial, because she had newly discovered evidence, and because the weight of the evidence did not support a finding of her criminal intent.
Appellant concedes the fact that the photos of the victim were not inadmissible by virtue of their gruesomeness, but claims instead that the pictures of the dead child were irrelevant because she was not charged with either murder or the actual beating of her son.
Evidence is relevant if it has any probative value, however slight, upon a matter at issue in the case. C. Gamble, McElroy's Alabama Evidence § 21.01 (3d ed. 1977). The matter at issue here was whether the appellant failed to remove the child from the destructive influence of her husband after having knowledge of his abuse of the child. The photographs showing the nature and location of bruises and other injuries on the child's body, tended to shed light on the issue of appellant's knowledge that her son was being abused, and therefore were relevant.
Appellant also maintains that she was entitled to a new trial because of newly discovered evidence which she presented in the form of an affidavit from Montgomery paramedic Paul Harper. Harper's statement included the fact that when he arrived on the scene the day of Jamie Weaver's death, he (Harper) cut pajamas away from the child's body. At trial, another paramedic, Buddy Pitts, had testified that the boy was not wearing pajamas and had no clothing covering his legs or chest that day.
Appellant argues that Pitts' testimony undermined her defense of being unaware of the severity of the child's injuries due to the fact that he was dressed in pajamas. She contends that Harper's affidavit contradicting Pitts entitled her to a new trial on the grounds of perjured testimony or "surprise."
In our judgment, the trial court was well within his discretion in ruling that Harper's affidavit did not entitle appellant to a new trial. To gain a new trial on the ground of newly discovered evidence, the defendant must allege and prove the following:
"(1) that the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching."
Bland v. State, 390 So.2d 1098, 1101-02 (Ala.Cr.App.), cert. denied, 390 So.2d 1109 (Ala.1980). Appellant's proffered evidence fails to meet all but the fourth criterion listed above.
Since there was other evidence pointing to appellant's unawareness of her child's injuries, we cannot say that Harper's testimony would "probably change the result" on a retrial. In addition, appellant knew, or by the exercise of due diligence could have determined, that Harper was at the scene on the day in question. See Gilley v. State, 367 So.2d 597, 599 (Ala.Cr.App.1978), cert. denied, 367 So.2d 600 (Ala.1979). Notwithstanding *737 appellant's claim that the prosecution had released Harper from his subpoena and he was therefore unavailable to testify for the defense, appellant could have requested an instanter subpoena and had the benefit of Harper's testimony. Finally, and more importantly, the evidence did not entitle appellant to a new trial because it was "merely cumulative [and] impeaching," Bland v. State, supra. It was cumulative to appellant's testimony and impeaching of Pitts's testimony at trial.
Furthermore, in the absence of an allegation and proof that Pitts's testimony was used by the prosecution with knowledge that it was perjured, that it was on a matter of such importance that the truth would have prevented the conviction, and that appellant was not dilatory in discovering the falsehood and raising the issue, Pitts's trial testimony, even if untrue, does not entitle appellant to another trial. See Summers v. State, 366 So.2d 336, 343 (Ala. Cr.App.1978), cert. denied, 366 So.2d 346 (Ala.1979).
When conflicting evidence on the issue of criminal intent presents a jury question, a motion for new trial based on the same grounds is properly overruled. Travis v. State, 32 Ala.App. 637, 29 So.2d 359 (1947).
We have examined the issues presented on appeal and have found no error. The judgment of conviction by the Montgomery Circuit Court is due to be and is hereby affirmed.
AFFIRMED.
All the Judges concur.